755 N.W.2d 57 (2008)
276 Neb. 448
STATE of Nebraska, appellee,
v.
Ion DRAGANESCU, appellant.
No. S-07-797.
Supreme Court of Nebraska.
August 22, 2008.
*69 Dennis R. Keefe, Lancaster County Public Defender, Lincoln, and Matthew G. Graff for appellant.
Jon Bruning, Attorney General, and Erin E. Leuenberger, Lincoln, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
CONNOLLY, J.

I. SUMMARY
A jury convicted Ion Draganescu of possession of a controlled substance with intent to deliver, a Class III felony. Although this appeal presents numerous issues, we believe there are three primary issues. First, did the Nebraska State Patrol have probable cause to initially stop the vehicle in which Draganescu was a passenger? Second, did the State Patrol have probable cause to search the vehicle? Third, was an airline ticket stub, which the State Patrol took from Draganescu's pocket after his arrest, admissible under the residual hearsay exception?
We spell out our holding with some specificity in the following pages, but briefly stated, it is this: We hold that the State Patrol did have probable cause to stop the vehicle. We further hold that the State Patrol had probable cause to search the van following a canine sniff. Finally, although the district court erred in admitting the airline ticket stub under the residual hearsay exception, we hold that this evidence was admissible as an adopted statement. We affirm.

II. BACKGROUND
On March 27, 2006, Nebraska State Trooper Chris Bigsby stopped a van on Interstate 80, just east of Lincoln. He stopped the van because the driver was following a semi-truck too closely. The driver was Herbert Truesdale; Draganescu was the passenger. While conducting an investigation incident to the stop, Bigsby became suspicious of drug activity and requested a canine unit. Following the canine sniff, troopers searched the van and found 275 pounds of marijuana. The State charged Draganescu with possession of a controlled substance with intent to deliver.
Draganescu moved to suppress any evidence obtained from the stop and search of his person and the van. He alleged that state troopers searched the van without probable cause or reasonable suspicion. The district court held two suppression hearings. The first focused on whether Bigsby had probable cause to stop the van; whether Bigsby had reasonable suspicion to order a canine sniff; and whether the length of the detentions was unreasonable. The second suppression hearing concerned the reliability of Duke, the drug dog. Draganescu argued that because Duke was unreliable, the State lacked probable cause to search the van.

1. FIRST SUPPRESSION HEARING

(a) Initial Stop of the Van
At the hearing, the State submitted a videotape from Bigsby's patrol car camera that shows the timeline of events. Bigsby testified that while in a marked patrol car monitoring traffic on Interstate 80 in Lincoln, he noticed the eastbound van in which Draganescu was a passenger. He thought he saw Nevada plates on the van. He testified that the van caught his eye because it "[a]ppeared to be possibly a rental and it was from Nevada. And I've had some success as far as Nevada plated vehicles and contraband and rental vehicles." *70 He pulled onto the interstate to observe the van and another vehicle.
Bigsby initially passed the van when he saw that the plates were from Washington instead of Nevada. But as he was passing the semi-truck in front of the van, he saw the van moving closer to the truck. From his rearview mirror, he saw the van was following the truck about one car length behind it and decided to stop the van. At 9:33 a.m., Bigsby stopped the van and asked for a vehicle registration and licenses from Truesdale and Draganescu. He intended to issue a warning ticket and asked Truesdale to sit in the patrol car while he issued the ticket.

(b) Detainment Before Issuing Warning Ticket
Bigsby testified that as he approached the van, he observed fast-food wrappers, trash, and pillows in the van. He described the van as having a "lived-in" look. He stated that while he was in the patrol car, the dispatcher informed him that the computer that runs background checks was down. He asked Truesdale about his travels and his criminal and driving history. Truesdale stated that he had one previous arrest for driving under the influence and another arrest because someone had possessed a gun while in his vehicle. He said that he had flown to Seattle, Washington, around March 2, 2006, and that Draganescu had flown to California. He said that after he rented the van in Washington, he went to Los Angeles, California, for a few days and then met up with Draganescu in Las Vegas, Nevada. He stated that Draganescu had flown to Las Vegas and that they stayed in Las Vegas for a couple of days in a hotel and then left on the previous Thursday or Friday. Truesdale gave Bigsby the rental agreement for the van, which showed that Truesdale was overdue to return the van.
Bigsby went to the van to get its vehicle identification number and return Draganescu's identification. He asked Draganescu about his travels. Draganescu said that he worked for a transport company in Detroit, Michigan, and had driven a truck to Seattle for them, where he met Truesdale. He said that he and Truesdale had left Seattle a couple of days ago and were driving straight back to Michigan on Interstate 80, without mentioning Las Vegas. He stated that they had been sleeping in the van at truck-stops on their way back. While Bigsby was returning to the patrol car, he called for a canine unit.
At 9:58 a.m., the dispatcher reported that there were no outstanding warrants and that Truesdale's license was valid. The dispatcher also reported that Draganescu had a drug-related criminal history. Bigsby finished writing the warning ticket at 10:01 a.m.

(c) Detainment After Issuing Warning Ticket
After Bigsby issued the warning ticket, Truesdale started to exit the patrol car. But Bigsby asked him if he could answer a few more questions, and Truesdale agreed. Bigsby testified that he asked Truesdale whether he would allow Bigsby to search the van and whether he would mind waiting for a dog to "come out and run around" the van. Truesdale refused consent. Bigsby then told him that he was being detained. After other troopers arrived, state troopers placed Draganescu in a different patrol car to wait while they conducted a canine sniff.
At 10:16 a.m., the canine unit arrived. At 10:25 a.m., Nebraska State Trooper Jeremy Dugger did a prestimulation ritual with Duke. Dugger then took Duke around the vehicle three times. After this deployment, Dugger took Duke away from the van briefly. At 10:30 a.m., Dugger deployed Duke again. After taking Duke *71 around the van two more times, Duke gave a final indication of drugs. At 10:32 a.m., Bigsby opened the van's hatch and discovered the drugs.

(d) District Court's Ruling
The district court found that there was probable cause to stop the van. It also found a sufficient factual basis to create a reasonable suspicion that Truesdale and Draganescu were involved in a crime that was occurring or about to occur. It further concluded that the detention for the traffic stop and the canine sniff was reasonable in length. The court overruled the motion to suppress.

2. SECOND SUPPRESSION HEARING REGARDING DUKE'S RELIABILITY
The second suppression hearing concerned Dugger's handling of Duke during the canine sniff. Draganescu argued that Dugger's mishandling of Duke made Duke's indication of drugs unreliable. Thus, he argued probable cause was lacking to conduct a search. Regarding his qualifications, Dugger testified that he had completed 8 weeks of canine training. He also stated that Duke was one of the Patrol's "most reliable and accurate dogs" and had received very high certification scores in 2005 and 2006.

(a) Duke's First Deployment
Dugger explained that he did a prestimulation ritual because Duke was distracted. The ritual involved Dugger's showing Duke a sterile ball, acting suspiciously with the ball alongside the van, and then putting the ball in his pants pocket when Duke was not watching. Without the ball, Dugger then took Duke around the van by his leash as he moved his other hand up and down the van in the places that he wanted Duke to sniff. They went around the van three times in this manner. Dugger stated that even though Duke seemed distracted, he had almost immediately alerted to the rear of the van. He described an "alert" as a change in the dog's body behavior that means the dog has noticed the odor of drugs. In contrast, an "indication" of drugs is the dog's prescribed behavior of barking, whining, or scratching, or a combination of these behaviors, to indicate the strongest source of the odor.

(b) Duke Tries Again
After these three rounds, Dugger told Bigsby that although Duke had alerted, the dog was distracted because of the rain and was not sniffing properly. Dugger took Duke away briefly and had another officer perform a prestimulation ritual with a different sterile toy. At 10:30 a.m., Dugger took Duke around the van two more times. He testified that Duke was sharper during this deployment because he was sniffing nasally with his mouth closed. At the end of the second round, Duke jumped up onto the rear bumper. Dugger testified that Duke scratched at the van, giving a final indication of drugs.

(c) Defense Expert Opines That Duke's Indication of Drugs Was "Possibly" Contaminated
The court also received, over the State's objections, an expert report from a retired Florida police officer, Bobby G. Mutter. Mutter had expertise with drug dogs. In his report, he stated that he had reviewed Dugger's deposition, Duke's training and service records, logs of Duke's history, and two videotape recordings of the stop and search. He concluded that Duke was a well-trained narcotics dog and had alerted to the rear of the van. But he believed that Dugger "could very possibly have contaminated this search by showing the canine an object prior to the search and going to the vehicle with the object[,] thus, making the dog think there was already drugs in the vehicle."
*72 The district court found that "[t]he evidence is uncontested that [Dugger] did not take an object to the vehicle." It therefore overruled Draganescu's motion to suppress "due to the handling of the drug sniffing dog."

3. DRAGANESCU'S TRIAL
During Draganescu's search incident to his arrest, troopers found an airline ticket stub in his pocket. The ticket stub, exhibit 20, was from U.S. Airways. It showed that Draganescu had a seat on a March 23, 2006, flight from Los Angeles to Las Vegas. The court overruled Draganescu's foundation, relevance, and hearsay objections to exhibit 20. Bigsby testified that 275 pounds of marijuana were found in the van. He further testified that the marijuana was worth $275,000 (or $1,000 a pound). He stated that this amount was consistent with distribution, not personal use. According to Bigsby, the State Patrol found no fingerprints or DNA evidence linking Draganescu to the drugs. Bigsby also stated that he did not smell marijuana in the van before or after the arrest.
After the State rested, Draganescu moved to dismiss. The court overruled the motion. At the jury instruction conference, the court also refused Draganescu's proposed jury instruction No. 3. This instruction set out a lesser-included offense of possession of more than 1 pound of marijuana. The jury returned a guilty verdict. The district court sentenced Draganescu to imprisonment for 5 to 11 years, with credit for time served. The court acknowledged that Draganescu's sentence was longer than Truesdale's sentence. But the court stated that it had reached its determination because of Draganescu's criminal history.

III. ASSIGNMENTS OF ERROR
Draganescu assigns, restated, that the district court erred in (1) overruling Draganescu's motion to suppress evidence that state troopers seized while searching the van and admitting this evidence at trial over his objections; (2) admitting exhibit 20, an airline ticket stub, over Draganescu's objections regarding relevancy, hearsay, and foundation; (3) failing to instruct the jury on the lesser-included offense of possession of marijuana; (4) finding there was sufficient evidence to support a conviction; and (5) imposing an excessive sentence.

IV. ANALYSIS

1. MOTIONS TO SUPPRESS
Draganescu argues that neither probable cause nor reasonable suspicion supported the following three searches or seizures: (1) the initial stop of the van; (2) his continued detention after the initial stop; and (3) the search of the van.

(a) Standard of Review
In reviewing a trial court's ruling on a motion to suppress based on the Fourth Amendment, we will uphold its findings of fact unless they are clearly erroneous.[1] But we review de novo the trial court's ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search.[2]

(b) Probable Cause to Stop the Van
Draganescu concedes that we have held traffic violations, no matter how minor, create probable cause to stop the driver of a vehicle.[3] But he contends that the *73 standard for determining that a driver is following a vehicle too closely is subjective. He also contends that the State failed to prove Truesdale violated the governing statute. He argues that because the standard is subjective, law enforcement officers could always rely on it to stop drivers for inarticulate hunches. He further argues that Bigsby admitted at trial that the real reason for the stop was his hunch that the passengers were involved in transporting contraband. He asks us to hold that under these circumstances, an officer's stop of a vehicle for this offense violates an individual's Fourth Amendment right to be free from unreasonable searches and seizures.
The Fourth Amendment to the U.S. Constitution and Neb. Const. art. I, § 7, guarantee "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a `seizure' of `persons' within the meaning of this provision."[4] Further, "`[a]n individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation.'"[5] But in determining whether the government's intrusion into a motorist's Fourth Amendment interests was reasonable,[6] the question is not whether the officer issued a citation for a traffic violation or whether the State ultimately proved the violation. Instead, a stop of a vehicle is objectively reasonable when the officer has probable cause to believe that a traffic violation has occurred.[7]
Draganescu argues that the rule he advocates is consistent with our holding in State v. Childs.[8] But he ignores a critical distinction. There, a police officer stopped the motorist to check his vehicle registration because of his in-transit tags. The motorist was not driving suspiciously and had not violated a statute. His vehicle's in-transit tags were in compliance with the governing statutes. We held that "a constitutional investigatory stop cannot be made solely to check a motorist's documentation when the vehicle is properly displaying in-transit tags."[9] In Childs, the officer lacked outward observable signs that would support probable cause to believe that the driver was violating any traffic regulation.[10]
In contrast, Bigsby had probable cause to stop the vehicle for a traffic violationfollowing too closely. Neb.Rev.Stat. § 60-6,140(1) (Reissue 2004) provides: "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, and such driver shall have due regard for the speed of such vehicles and the traffic upon and the condition *74 of the roadway." But we need not analyze Draganescu's argument that the "reasonable and prudent" standard is too indefinite or subjective because he has not challenged the statute for vagueness. Moreover, Bigsby testified that he used an objective standard for determining whether the van was following the truck too closely: one car length for every 10 m.p.h. of speed. Bigsby further stated that he observed the van following one car length behind the semi-truck while both vehicles were traveling over 70 m.p.h. in the rain.
Because this evidence showed Bigsby had probable cause to believe a traffic violation had occurred, the stop was objectively reasonable. Although Draganescu disputes Bigsby's motivation for stopping the van, the issue is irrelevant. Both the U.S. Supreme Court and this court have rejected "pretextual" arguments regarding routine traffic stops. "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."[11] If an officer has probable cause to stop a violator, the stop is objectively reasonable and any ulterior motivation is irrelevant.[12] Draganescu's argument that the initial stop was unsupported by probable cause is without merit.

(c) Reasonable, Articulable Suspicion to Justify Draganescu's Continued Detention
Draganescu does not appeal the district court's decision that the length of his detention was reasonable. Instead, he contends that Bigsby did not have reasonable suspicion to enlarge the scope of the traffic stop and detain him for a canine sniff after Truesdale attempted to exit the patrol car.
To detain a motorist for further investigation past the time reasonably necessary to conduct a routine investigation incident to a traffic stop,[13] an officer must have a reasonable, articulable suspicion that the motorist is involved in criminal activity unrelated to the traffic violation.[14] Reasonable suspicion for further detention must exist after the point that an officer issues a citation.[15]
Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances.[16] Courts must determine whether reason-able suspicion exists on a case-by-case basis.[17] Reasonable suspicion entails some minimal level of objective justification for detention. It is something more than an inchoate and unparticularized hunch  but less than the level of suspicion required for probable cause.[18]
Regarding an officer's reasonable suspicion, we have previously considered factors similar to those present in this case. Those factors included an officer's testimony that (1) the motorist had not taken the most direct route from the occupants' *75 stated point of origin to their stated destination[19] and (2) the driver or passengers gave implausible or contradictory answers regarding their travel plans.[20] And, although of limited usefulness, a court may consider, with other factors, evidence that the occupants exhibited nervousness.[21] Finally, a court can consider, as part of the totality of the circumstances, the officer's knowledge of a person's drug-related criminal history.[22]
Moreover, factors that would independently be consistent with innocent activities may nonetheless amount to reasonable suspicion when considered collectively.[23] For example, evidence that a motorist is returning to his or her home state in a vehicle rented from another state is not inherently indicative of drug trafficking when the officer has no reason to believe the motorist's explanation is untrue.[24] But a court may nonetheless consider this factor when combined with other indicia that drug activity may be occurringparticularly the occupants' contradictory answers regarding their travel purpose and plans[25] or an occupant's previous drug-related convictions.[26]
Here, the rental agreement showed that Truesdale should have returned the van to Seattle 5 days before the traffic stop. His explanation to Bigsby that he had obtained a 3-day extension did not explain why the van was in Nebraska 2 days after it was due for return in Washington.[27] More important, Draganescu's statement that he and Truesdale were traveling straight back to Michigan from Washington was inconsistent with their presence on Interstate 80 in Nebraska. And, most telling, Truesdale and Draganescu gave contradictory answers about their travel plans. Finally, Draganescu's background check revealed a drug-related criminal history. Considering the totality of these circumstances, we conclude that these facts, when viewed from the standpoint of an objectively reasonable police officer,[28] created a reasonable, articulable suspicion. The court did not err in concluding that Bigsby had a reasonable, articulable suspicion that Truesdale and Draganescu were involved in unlawful activity at the time Bigsby issued the warning citation.

(d) Probable Cause to Search the Van
Draganescu argues that probable cause to search the van hinged on Duke's reliability. He claims that the district court clearly erred in finding that Dugger did not approach the van with an object in his hand. He also claims that the videotape clearly shows Dugger did not properly handle Duke during the canine sniff.
Generally, the factors supporting an officer's reasonable suspicion of illegal drug activity when coupled with a welltrained dog's positive indication of drugs in a vehicle will give the officer probable cause to search the vehicle.[29] Draganescu's *76 expert agreed that the evidence showed Duke was a well-trained drug dog and had alerted to the rear of the van.
Draganescu, however, contends that the court did not need an expert to conclude that the canine sniff was improperly conducted for two reasons. First, Duke scratched the rear of the van only after Dugger placed his hands there. Second, it took Duke five trips around the van before he indicated drugs. But Dugger explained that Duke was distracted during the first deployment because of the rain. The videotape showed that Duke scratched the van's rear door, indicating drugs, on his second trip around the van during the second deployment. Dugger further explained that he moves his hands around a vehicle to direct the dog to a place he wants it to sniff, and he did this throughout both deployments. Without countervailing evidence, Dugger's training and experience and Duke's training and past reliability satisfy us that the procedures used did not improperly cause Duke to indicate drugs.
We agree with Draganescu's argument that the district court clearly erred in finding that Dugger did not take an object to the van. The court apparently focused only on the second deployment. But the videotape shows that before Duke's first deployment, Dugger displayed a ball to Duke, acted suspiciously with the ball around the van while the dog was watching, and then showed Duke a clean hand. Again, however, Dugger testified that this prestimulation ritual was a part of Duke's training and that he received the same training that many states use. The statements in Draganescu's expert's report are inconclusive. Mutter stated that Dugger "could very possibly have contaminated the search" by using this ritual during an actual deployment because dogs are initially trained to alert by using the same method.
In an unpublished opinion, the Nebraska Court of Appeals considered this same expert's report in reviewing Truesdale's joint suppression hearing.[30] It concluded that the expert's critical comments were mere conjecture. We agree that Mutter's statements in his report did not undermine the district court's determination that Dugger's handling of Duke had not contaminated the canine sniff. We conclude in our de novo review that the state troopers had probable cause to search the van.

2. ADMISSIBILITY OF AIRLINE TICKET STUB
The court admitted the airline ticket stub, exhibit 20. This exhibit showed that Draganescu had a seat on a March 23, 2006, flight from Los Angeles to Las Vegas. The court overruled Draganescu's objections and ruled that (1) the evidence was relevant; (2) it was properly authenticated by testimony that the ticket stub was found on Draganescu's person after he was arrested; and (3) it was admissible under the residual hearsay exception. Draganescu argues that the court erred in all three rulings.

(a) Standard of Review
In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[31] Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, we review *77 the admissibility of evidence for an abuse of discretion.[32]

(b) Relevance of Exhibit 20
Draganescu contends that exhibit 20 was not relevant because it was not probative of any material element of the crime. The State counters that exhibit 20 showed Draganescu was lying to Bigsby when he stated that he was only in the van to catch a ride home from Washington. It contends that exhibit 20 was therefore relevant to show Draganescu's real purpose for being in the van was his possession of the marijuana and his intent to deliver it.

(i) Standard of Review
The exercise of judicial discretion is implicit in determining the relevance of evidence. And a trial court's decision regarding relevance will not be reversed absent an abuse of discretion.[33] Evidence is relevant if it tends in any degree to alter the probability of a material fact.[34] Relevancy requires only that the degree of probativeness be something more than nothing.[35]

(ii) Analysis
Exhibit 20 is relevant because a juror could infer from this circumstantial evidence that Draganescu lied about traveling with Truesdale from Washington to dissociate himself from their purpose in California and Nevadaillegal drug activity. Evidence of a defendant's consciousness of guilt is relevant as a circumstance supporting an inference that the defendant is guilty of the crime charged.[36] When the evidence is sufficient to justify an inference that the defendant acted with consciousness of guilt, the fact finder can consider such evidence even if the conduct could be explained in another way.[37] Many courts have held that, unlike general denials of guilt, a defendant's exculpatory statements of fact that are proved to be false at trial are probative of the defendant's consciousness of guilt.[38] We agree. We conclude that the district court did not abuse its discretion in determining that evidence showing Draganescu made false exculpatory statements is relevant to his guilt.

(c) Admissibility of Exhibit 20 Under Nebraska's Hearsay Rules
Draganescu contends that exhibit 20 was hearsay and was not admissible under the residual hearsay exception because the State did not show that the declarant was unavailable. The State does not contend that exhibit 20 was admissible under the residual hearsay exception. Instead, it contends that the ticket stub was not a hearsay statement for two reasons: (1) A computer produced it, and (2) Draganescu adopted the statement through his possession of it.
*78 Before analyzing the hearsay issue, we explain why we are not first analyzing a preliminary questionauthentication. Neb. Evid. R. 104(1),[39] like its federal counterpart,[40] requires a trial court to determine preliminary questions of admissibility. Unlike its federal counterpart, however, Nebraska's rule 104(1) does not include this final sentence: "In making its determination [the court] is not bound by the rules of evidence except those with respect to privileges."[41] Because of this pro-vision, federal courts frequently decide authentication issues before hearsay issues. Those courts reason that "[a]uthenticity and admissibility, though often closely related, are separate inquiries. The mere fact that a document is authentic does not necessarily mean that it is admissible in evidence."[42] But Nebraska's rule 104 does not permit that order of analysis. We must first determine whether the district court properly ruled that exhibit 20 was not hearsay before considering whether the document's contents could support the court's ruling that it was properly authenticated.

(i) Standard of Review
We pause here to clarify our standard of review for hearsay rulings. Hearsay is not admissible except as provided by the Nebraska Evidence Rules.[43] In State v. Jacob,[44] we held that a trial judge does not have discretion to admit inadmissible hearsay statements. So we overruled cases applying an abuse of discretion standard to review rulings under the excited utterances exception to hearsay. Shortly after issuing this opinion, however, we implicitly carved out an exception for the residual hearsay exception. We did this because of the factors a trial court must weigh in deciding whether to admit evidence under this exception.[45] Thus, we have applied an abuse of discretion standard to review hearsay rulings under the residual hearsay exception.[46]
In three other cases, we have stated that we will uphold a court's application of the Nebraska Evidence Rules unless clearly erroneous when judicial discretion is not a factor in assessing admissibility.[47] In these cases, however, we have not distinguished between findings of fact and conclusions of law. "Clearly erroneous" is the standard we normally apply for reviewing a district court's underlying factual findings when the issue on appeal presents a mixed question of fact and law.[48] But when judicial discretion is not a factor, whether the underlying facts satisfy the legal rules governing the admissibility of such evidence is a question of law, subject *79 to de novo review.[49] This rule is consistent with other courts' de novo review of a trial court's application of hearsay rules.[50] Thus, we adopt the following standard of review for hearsay rulings: Apart from rulings under the residual hearsay exception, we review for clear error the factual findings underpinning a trial court's hearsay ruling and review de novo the court's ultimate determination to admit evidence over a hearsay objection.

(ii) Analysis
We have determined that exhibit 20 was relevant to prove that Draganescu lied to Bigsby when he stated that he and Truesdale were traveling straight back to Michigan from Washington. Thus, the airline ticket stub was a written assertion offered to prove the truth of the matter asserted, i.e., that Draganescu had a reserved seat on a flight from Los Angeles to Las Vegas on March 23, 2006. Exhibit 20 was intended to support a finding that contrary to his statements to Bigsby, Draganescu had been in California just before driving through Nebraska. The State does not contend otherwise. A written assertion is a statement under Neb. Evid. R. 801(1).[51] Because it was a statement offered to prove the truth of the matter asserted, it is hearsay under rule 801(3) unless it falls within an exception or exclusion under the hearsay rules.
We reject the State's assertion that the document was not hearsay because a computer produced it. Computerized printouts that are merely the visual counterparts to routine electronic business records are usually hearsay, but they can be admissible under the business records exception.[52] Here, the State did not attempt to lay foundation for the business records exception. The court, however, admitted exhibit 20 under the residual hearsay exception.
We agree with Draganescu that the district court erred in admitting exhibit 20 under the residual hearsay exception. Neb. Evid. R. 804(2)(e)[53] provides in part:
A statement may not be admitted under this exception unless the proponent of it makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.
An adverse party's knowledge of a statement is not enough to satisfy the notice requirement of rule 804(2)(e).[54] The proponent of the evidence must provide notice before trial to the adverse party of his or her intentions to use the statement to take advantage of the residual hearsay exception under rule 804(2)(e).[55]
*80 The record fails to show that the State provided Draganescu with advance notice of its intent to use exhibit 20. The first mention in the record of the State's intent to use exhibit 20 is during his trial. The court's admission of the evidence under this exception was error. But where the record adequately demonstrates that the decision of a trial court is correct  although such correctness is based on a ground or reason different from that assigned by the trial courtan appellate court will affirm.[56] We conclude that under these circumstances, exhibit 20 was admissible as an adopted statement. We note that when the prevailing party has laid sufficient foundation for the application of another rule, federal appellate courts will similarly consider whether the evidence was admissible under that rule for the same purposethe truth of the matter asserted.[57]
Although a party on appeal may not assert a different ground for an objection to the admission of evidence than was offered to the trial court,[58] the considerations are different when it was unnecessary for the prevailing party to raise an alternative ground for admission to the trial court.[59] We agree with the federal courts of appeals that hold an appellate court can consider whether the record clearly shows an exhibit was admissible for the truth of the matter asserted under a different rule from the one applied by the trial court when both parties had a fair opportunity to develop the record on the underlying facts.
As noted, we conclude that exhibit 20 was admissible as an adopted statement. Rule 801(4)(b) excludes a statement from the definition of hearsay if it is "offered against a party and is ... (ii) a statement of which he has manifested his adoption or belief in its truth." When a Nebraska Evidence Rule is substantially similar to a corresponding federal rule of evidence, Nebraska courts may look to federal decisions interpreting the corresponding federal rule for guidance in construing the Nebraska rule.[60] Under the federal counterpart to Nebraska's rule 801(4)(b)(ii), a party's possession of a written statement can be an adoption of what its contents reveal under circumstances that tie the party to the document in a meaningful way.[61]
For example, in U.S. v. Paulino,[62] the First Circuit affirmed the trial court's admission of a receipt for a postal service money order. Police found the receipt during the search of an uninhabited apartment used as a drug distribution outlet. The receipt bore the defendant's name and the apartment's address. It also included a notation that the money order was for the preceding month's rent. There was no *81 testimony from the landlord or building management. The defendant challenged the admission of the evidence on authentication and hearsay grounds.
The First Circuit reasoned that in addition to possession, other circumstances tied the defendant to the document. The court noted that the document bore the defendant's name and that he had a key to the apartment, had been seen there, and was privy to the criminal enterprise. These circumstances were sufficient to permit a finding that he had "possessed and adopted" the document.[63] The Ninth Circuit similarly held that a motel receipt found on a defendant's person after his arrest was an adopted admission.[64] Finally, the Sixth Circuit held that airline tickets found in the possession of the defendants were admissible as adoptive statements.[65]
Similarly here, exhibit 20 bore Draganescu's name and was not the type of document that a person would have had in his possession if it were not his own. Further, the evidence was consistent with Truesdale's statement that Draganescu had flown to Las Vegas. We conclude that the circumstances are sufficient to show that Draganescu adopted the written statement by his possession of it. Exhibit 20 was not hearsay.

(d) Authentication of Exhibit 20
Authentication or identification of evidence is a condition precedent to its admission and is satisfied by evidence sufficient to prove that the evidence is what the proponent claims.[66] Draganescu does not contend that the State failed to establish a chain of custody showing that exhibit 20 is the document state troopers took from his pocket when he was arrested. Instead, he contends that Bigsby's testimony was insufficient foundation because Bigsby did not have personal knowledge that exhibit 20 is what the State claims, i.e., an airline ticket stub. The State contends that exhibit 20 was authenticated by its appearance, contents, substance, internal patterns, or other distinctive characteristics under Neb. Evid. R. 901(2)(d).[67]

(i) Standard of Review
A court must determine whether there is sufficient foundation evidence for the admission of physical evidence on a case-by-case basis.[68] Because authentication rulings are necessarily fact specific, a trial court has discretion to determine whether evidence has been properly authenticated.[69] We review a trial court's ruling on authentication for abuse of discretion.[70]

(ii) Analysis
Rule 901 does not impose a high hurdle for authentication or identification.[71] *82 A proponent of evidence is not required to conclusively prove the genuineness of the evidence or to rule out all possibilities inconsistent with authenticity.[72] If the proponent's showing is sufficient to support a finding that the evidence is what it purports to be, the proponent has satisfied the requirement of rule 901(1).[73]
A proponent may authenticate a document under rule 901(2)(a) by the testimony of someone with personal knowledge that it is what it is claimed to be, such as a person familiar with its contents.[74] But that is not the exclusive means. Under rule 901(2)(d), a proponent may authenticate a document by circumstantial evidence, or its "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances."[75]
Courts have recognized distinctive labels and brands as prima facie evidence of ownership or origin.[76] Neb. Evid. R. 902(7)[77] specifically includes as self-authenticating "[i]nscriptions, signs, tags, or labels purporting to have been affixed in the course of business and indicating ownership, control or origin." In this case, exhibit 20 bears the airline's distinctive logotype on both sides and its contact information. Exhibit 20's contents identify the passenger as Draganescu. They also provide the typical flight information found on all airline tickets or boarding passes. The information includes the date of flight, gate and seat numbers, boarding and departure times, and departure and arrival cities.
We conclude that the information contained in exhibit 20 supported a finding that it was what it purported to be: the tear-off portion of an airline ticket or boarding pass. A defendant challenging the "type" of document the State produces may refute the obvious inference. Normally, external evidence would be required to authenticate the contents of a ticket that is produced to prove that its contents are true. Here, however, the normal foundation requirements to ensure reliability are lessened because state troopers found the ticket stub on Draganescu's person.[78] We conclude that the contents of exhibit 20 and Draganescu's possession of it were sufficient to support a finding that Draganescu flew from Los Angeles to Las Vegas on March 23, 2006. Under the totality of the circumstances, we are satisfied that the district court did not abuse its discretion in admitting the evidence.

3. INSTRUCTION ON LESSER-INCLUDED OFFENSE OF SIMPLE POSSESSION
The court instructed the jury that it could return a verdict of not guilty or "Guilty of Manufacture, Distribution, Delivery, *83 or Dispensing a Controlled Substance." The court also instructed the jury, restated and condensed, that the State must prove beyond a reasonable doubt that Draganescu had knowingly or intentionally (1) possessed marijuana with the intent to distribute or deliver it or (2) aided and abetted another to possess marijuana with the intent to distribute or deliver it.[79]
Draganescu contends that the district court erred in failing to instruct the jury on simple possession. Relying on a Court of Appeals' decision,[80] Draganescu contends that possession of marijuana over 1 pound is a lesser-included offense of possession of marijuana with intent to deliver, regardless of the weight of the marijuana possessed. He further contends that the evidence adduced at his trial provided a rational basis for a juror to acquit him of possession with intent to deliver and convict him of simple possession.

(a) Standard of Review
Whether a crime is a lesser-included offense is determined by a statutory elements approach and is a question of law.[81] Whether jury instructions given by a trial court are correct is a question of law.[82] When reviewing questions of law, we resolve the questions independently of the lower court's conclusions.[83]

(b) Analysis
A court must instruct on a lesser-included offense if (1) the elements of the lesser offense for which an instruction is requested are such that one cannot commit the greater offense without simultaneously committing the lesser offense and (2) the evidence produces a rational basis for acquitting the defendant of the greater offense and convicting the defendant of the lesser offense.[84] To determine whether one statutory offense is a lesserincluded offense of the greater, Nebraska courts look to the elements of the crime and not to the facts of the case.[85]
In looking to the elements, Neb.Rev. Stat. § 28-416(1) (Cum.Supp.2006) provides in part: "Except as authorized by the Uniform Controlled Substances Act, it shall be unlawful for any person knowingly or intentionally: (a) To manufacture, distribute, deliver, dispense, or possess with intent to manufacture, distribute, deliver, or dispense a controlled substance." Marijuana is a Schedule I controlled substance.[86] As relevant here, § 28-416(1)(a) criminalizes the act of knowingly or intentionally possessing marijuana with the intent to distribute or deliver it. For simple possession, § 28-416(12) provides: "Any person knowingly or intentionally possessing marijuana weighing more than one pound shall be guilty of a Class IV felony."
This court has previously held that possession of a controlled substance is a lesser-included offense of distribution of the *84 controlled substance.[87] The Nebraska Court of Appeals has specifically held that possession of marijuana weighing more than 1 pound is a lesser-included offense of possession with intent to deliver the marijuana.[88] The State does not dispute this point. The issue here is whether the evidence provided a rational basis for acquitting Draganescu of the greater offense and convicting him of the lesser offense.
Draganescu argues that the jury could have believed that he was simply catching a ride home with Truesdale and that he was not involved in the distribution or delivery of marijuana, even if he was aware of its presence in the van. The State contends that because of the quantity of marijuana found in the van, a jury could not have rationally found that Draganescu possessed the marijuana without also finding that he possessed it with the intent to deliver or distribute.
Draganescu's argument that the jury could have found he only knew there was marijuana in the van is an argument for acquittal  it is not a rational basis upon which a jury could have convicted him of simple possession. Proving Draganescu's knowledge alone would have been insufficient to satisfy the elements of either simple possession of the marijuana or possession with the intent to deliver it. The State was also required to prove Draganescu's control or dominion over the marijuana or that he aided and abetted Truesdale's control and dominion over the marijuana.[89] And the court instructed the jury to that effect: "`Possession' of a controlled substance means either knowingly having it on one's person or knowing of the substance's presence and having control over the substance, mere presence is not sufficient."[90] Under this instruction, the jury could not have found that Draganescu had possessed the marijuana unless it found that he had control over it. Thus, the only issue is whether there was a rational basis for a jury to conclude that Draganescu did not intend to deliver the marijuana.
We have held that evidence of the quantity of a controlled substance possessed combined with expert testimony that such quantity indicates an intent to deliver can be sufficient for a jury to infer an intent to deliver.[91] When the prosecution has offered uncontroverted evidence on an element necessary for a conviction of the greater crime but not necessary for the lesser offense, the defendant must offer some evidence to dispute this issue if he or she wishes to have the benefit of a lesser-offense instruction.[92] Because Draganescu did not dispute the State's evidence on the separate element of intent to deliver, he was not entitled to an instruction on the lesser-included offense of simple possession.

4. SUFFICIENCY OF THE EVIDENCE
Draganescu contends that the evidence was insufficient to sustain his conviction because the only direct evidence linking him to the marijuana was his presence in the van. He argues that his mere presence in the place where the marijuana was *85 found is insufficient to show his knowledge of it. The State contends that the circumstantial evidence established Draganescu's guilt beyond a reasonable doubt.

(a) Standard of Review
When reviewing for sufficiency of the evidence to sustain a conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[93] Regardless of whether the evidence is direct, circumstantial, or a combination thereof, an appellate court, in reviewing a criminal conviction, does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence.[94]

(b) Analysis
Constructive possession of an illegal substance may be proved by direct or circumstantial evidence.[95] It is true that a passenger's mere presence in a vehicle with contraband is insufficient to support a finding of joint possession.[96] But possession of an illegal substance can be inferred from a vehicle passenger's proximity to the substance or other circumstantial evidence that affirmatively links the passenger to the substance.[97] Generally, a passenger's joint possession of a controlled substance found in a vehicle can be established by evidence that (1) supports an inference that the driver was involved in drug trafficking, as distinguished from possessing illegal drugs for personal use; (2) shows the passenger acted suspiciously during a traffic stop; and (3) shows the passenger was not a casual occupant but someone who had been traveling a considerable distance with the driver.[98] Courts have reasoned in part that a juror may reasonably infer that a driver with a possessory interest in a vehicle who is transporting a large quantity of illegal drugs would not invite someone into his or her vehicle who had no knowledge of the driver's drug activities.[99] We agree.
Here, Draganescu admitted that he had been traveling with Truesdale and that they had been sleeping in the van. The drugs were easily accessible to someone from the back seat. The quantity of marijuana was sufficient to support an inference that Truesdale was engaged in illegal drug trafficking[100] and that he would not have invited Draganescu to travel with him if he had no knowledge of the scheme. Truesdale's and Draganescu's explanations of their travel plans were contradictory. These contradictory statements supported an inference that they were attempting to conceal their activities. *86 Finally, Draganescu made false exculpatory statements regarding his presence in California. A juror could reasonably infer that he was attempting to distance himself from traveling with Truesdale in California because of their illegal activities there. We conclude that the totality of the circumstantial evidence supported the jury's finding that Draganescu jointly possessed the marijuana.
Circumstantial evidence may also support a finding that a defendant intended to distribute, deliver, or dispense a controlled substance.[101] Circumstantial evidence to establish possession of a controlled substance with intent to distribute or deliver may consist of several factors: the quantity of the substance, the equipment and supplies found with it, the place it was found, the manner of packaging, and the testimony of witnesses experienced and knowledgeable in the field.[102] Bigsby's testimony established that this quantity of marijuana showed an intent to distribute, and Draganescu does not contend otherwise.

5. EXCESSIVE SENTENCE
Finally, Draganescu argues that his sentence was excessive because he was eligible for intensive supervised probation and his incarceration will impose a hardship on his wife and family.

(a) Standard of Review
Sentences within statutory limits will be disturbed by an appellate court only if the sentences complained of were an abuse of judicial discretion.[103]

(b) Analysis
When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the violence involved in the commission of the crime.[104] Possession of a controlled substance with intent to deliver is a Class III felony,[105] punishable by 1 to 20 years' imprisonment, a $25,000 fine, or both.[106] Because of his previous drug convictions, the district court sentenced Draganescu to 5 to 11 years' imprisonment, a sentence clearly within the statutory limits. After reviewing the record and the presentence investigation report, which reflects previous drug-related convictions and sentences of probation, we conclude that the district court's sentence was not an abuse of its discretion.

V. CONCLUSION
We conclude that the district court did not err in overruling Draganescu's motion to suppress evidence. The state trooper had probable cause to stop the vehicle, in which Draganescu was a passenger, for a traffic violation; reasonable suspicion to detain the occupants for further investigation; and probable cause to search the vehicle. We further conclude that the district court did not err in admitting exhibit *87 20 over Draganescu's foundation, hearsay, and relevance objections. Nor did the court err in failing to instruct the jury on the lesser-included offense of simple possession. Finally, we conclude that the evidence was sufficient to support Draganescu's conviction and that the court did not err in sentencing him to 5 to 11 years' imprisonment.
AFFIRMED.
NOTES
[1] See State v. Royer, 276 Neb. 173, 753 N.W.2d 333 (2008).
[2] See id.
[3] See, e.g., State v. Louthan, 275 Neb. 101, 744 N.W.2d 454 (2008).
[4] Whren v. United States, 517 U.S. 806, 809-10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Accord State v. Burdette, 259 Neb. 679, 611 N.W.2d 615 (2000).
[5] State v. Childs, 242 Neb. 426, 432, 495 N.W.2d 475, 479 (1993), quoting Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).
[6] See State v. Davidson, 260 Neb. 417, 618 N.W.2d 418 (2000).
[7] Whren, supra note 4; State v. Dallmann, 260 Neb. 937, 621 N.W.2d 86 (2000).
[8] Childs, supra note 5.
[9] State v. Bowers, 250 Neb. 151, 160, 548 N.W.2d 725, 731 (1996) (distinguishing Childs, supra note 5).
[10] See, State v. Crom, 222 Neb. 273, 383 N.W.2d 461 (1986), citing Prouse, supra note 5.
[11] Whren, supra note 4, 517 U.S. at 813, 116 S.Ct. 1769.
[12] See, Dallmann, supra note 7; State v. Bartholomew, 258 Neb. 174, 602 N.W.2d 510 (1999).
[13] See State v. Voichahoske, 271 Neb. 64, 709 N.W.2d 659 (2006).
[14] See, Louthan, supra note 3; Voichahoske, supra note 13; State v. Anderson, 258 Neb. 627, 605 N.W.2d 124 (2000), disapproved in part on other grounds. State v. McCulloch, 274 Neb. 636, 742 N.W.2d 727 (2007).
[15] See, State v. Lee, 265 Neb. 663, 658 N.W.2d 669 (2003); Anderson, supra note 14.
[16] Louthan, supra note 3.
[17] See id.
[18] Id.
[19] Voichahoske, supra note 13.
[20] See, id.; State v. Verling, 269 Neb. 610, 694 N.W.2d 632 (2005); Lee, supra note 15.
[21] Verling, supra note 20; Lee, supra note 15.
[22] Lee, supra note 15. Accord, U.S. v. Finke, 85 F.3d 1275 (7th Cir.1996). See, also. U.S. v. McRae, 81 F.3d 1528 (10th Cir.1996).
[23] See Voichahoske, supra note 13.
[24] See U.S. v. Beck, 140 F.3d 1129 (8th Cir. 1998).
[25] See Verling, supra note 20.
[26] See Finke, supra note 22.
[27] See McRae, supra note 22.
[28] See State v. Eberly, 271 Neb. 893, 716 N.W.2d 671 (2006).
[29] See Verling, supra note 20.
[30] See State v. Truesdale, No. A-07-715, 2008 WL 582530 (Neb.App. March 4, 2008) (not designated for permanent publication).
[31] State v. Kuehn, 273 Neb. 219, 728 N.W.2d 589 (2007).
[32] See State v. Stark, 272 Neb. 89, 718 N.W.2d 509 (2006).
[33] See State v. Archie, 273 Neb. 612, 733 N.W.2d 513 (2007).
[34] State v. Jackson, 275 Neb. 434, 747 N.W.2d 418 (2008).
[35] Id.
[36] See, State v. Kramer, 238 Neb. 252, 469 N.W.2d 785 (1991); State v. Lonnecker, 237 Neb. 207, 465 N.W.2d 737 (1991).
[37] See, State v. Jacob, 253 Neb. 950, 574 N.W.2d 117 (1998); State v. Curlile, 11 Neb. App. 52, 642 N.W.2d 517 (2002).
[38] See, e.g., U.S. v. Glenn, 312 F.3d 58 (2d Cir.2002); United States v. McDougald, 650 F.2d 532 (4th Cir.1981); United States v. Merrill, 484 F.2d 168 (8th Cir.1973); U.S. v. Isaac-Sigala, 448 F.3d 1206 (10th Cir.2006); People v. Hughes, 27 Cal.4th 287, 116 Cal. Rptr.2d 401, 39 P.3d 432 (2002); Perry v. State, 344 Md. 204, 686 A.2d 274 (1996).
[39] Neb.Rev.Stat. § 27-104(1) (Reissue 1995).
[40] Fed.R.Evid. 104(a).
[41] Id.
[42] U.S. v. Paulino, 13 F.3d 20, 24 (1st Cir. 1994). Accord U.S. v. Chu Kong Yin, 935 F.2d 990 (9th Cir. 1991).
[43] State v. Gutierrez, 272 Neb. 995, 726 N.W.2d 542 (2007).
[44] See State v. Jacob, 242 Neb. 176, 494 N.W.2d 109 (1993).
[45] State v. Toney, 243 Neb. 237, 498 N.W.2d 544 (1993), citing Huff v. White Motor Corp., 609 F.2d 286 (7th Cir. 1979).
[46] See, e.g., State v. Robinson, 271 Neb. 698, 715 N.W.2d 531 (2006); State v. Garner, 260 Neb. 41, 614 N.W.2d 319 (2000).
[47] See, State v. Neal, 265 Neb. 693, 658 N.W.2d 694 (2003); State v. Rieger, 260 Neb. 519, 618 N.W.2d 619 (2000); State v. Canbaz, 259 Neb. 583, 611 N.W.2d 395 (2000).
[48] See, e.g., State v. Mata, 275 Neb. 1, 745 N.W.2d 229 (2008).
[49] See, e.g., Eberly, supra note 28. See, also, U.S. v. Salgado, 250 F.3d 438 (6th Cir.2001).
[50] See, e.g., U.S. v. Gaitan-Acevedo, 148 F.3d 577 (6th Cir.1998); Zacarias v. U.S., 884 A.2d 83 (D.C.2005); Burkey v. State, 922 So.2d 1033 (Fla.App.2006); State v. Newell, 710 N.W.2d 6 (Iowa 2006); State v. White, 804 A.2d 1146 (Me.2002); Bernadyn v. State, 390 Md. 1, 887 A.2d 602 (2005); State v. Schiefelbein, 230 S.W.3d 88 (Tenn.Crim.App.2007).
[51] Neb.Rev.Stat. § 27-801(1) (Reissue 1995).
[52] See State v. Robinson, 272 Neb. 582, 724 N.W.2d 35 (2006).
[53] Neb.Rev.Stat. § 27-804(2)(e) (Reissue 1995).
[54] See Robinson, supra note 46.
[55] Id. See, also, State v. Castor, 262 Neb. 423, 632 N.W.2d 298 (2001).
[56] State v. Marshall, 269 Neb. 56, 690 N.W.2d 593 (2005).
[57] See, e.g., Paulino, supra note 42; U.S. v. Knox, 124 F.3d 1360 (10th Cir.1997); U.S. v. Williams, 837 F.2d 1009 (11th Cir.1988). See, also, United States v. Rosenstein, 474 F.2d 705 (2d Cir.1973) (distinguishing U.S. Supreme Court decisions).
[58] See Robinson, supra note 52.
[59] See United States v. Pugliese, 712 F.2d 1574 (2d Cir.1983). See, also, Blum v. Bacon, 457 U.S. 132, 102 S.Ct. 2355, 72 L.Ed.2d 728 (1982).
[60] State v. Morrow, 273 Neb. 592, 731 N.W.2d 558 (2007), disapproved in part on other grounds, McCulloch, supra note 14.
[61] Paulino, supra note 42, citing United States v. Ospina, 739 F.2d 448 (9th Cir. 1984). See, also. Annot., 156 A.L.R. Fed. 217 (1999).
[62] Paulino, supra note 42.
[63] Id. at 24.
[64] See Ospina, supra note 61. See, also, U.S. v. Merritt, Nos. 96-4149, 96-4177, 96-4196, 1998 WL 196614 (4th Cir. Apr.22, 1998) (unpublished disposition listed in table of "Decisions Without Published Opinions" at 145 F.3d 1327 (4th Cir. 1998)).
[65] United States v. Marino, 658 F.2d 1120 (6th Cir. 1981).
[66] Neb. Evid. R. 901(1), Neb.Rev.Stat. § 27-901(1) (Reissue 1995).
[67] Id.
[68] See State v. Anglemyer, 269 Neb. 237, 691 N.W.2d 153 (2005).
[69] See id. See, also, U.S. v. Alicea-Cardoza, 132 F.3d 1 (1st Cir.1997).
[70] See State v. Huffman, 181 Neb. 356, 148 N.W.2d 321 (1967). See, also, 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 901.02[4] (Joseph M, McLaughlin ed., 2d ed.2008).
[71] See Anglemyer, supra note 68.
[72] See id.
[73] See id. See, also. Alicea-Cardoza, supra note 69; U.S. v. Ruggiero, 928 F.2d 1289 (2d Cir.1991). citing 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 901(a)[01] (1990).
[74] State v. Jacobson, 273 Neb. 289, 728 N.W.2d 613 (2007).
[75] See, U.S. v. Reilly, 33 F.3d 1396 (3d Cir. 1994); Anglemyer, supra note 68. quoting 28 U.S.C. app. rule 901 (2000).
[76] See, Los Angeles News Service v. CBS Broadcasting, Inc., 305 F.3d 924 (9th Cir. 2002). amended on other grounds 313 F.3d 1093; State v. Rines, 269 A.2d 9 (Me.1970). See, also, 2 McCormick on Evidence § 229.1 (Kenneth S. Broun et al. eds., 6th ed.2006).
[77] Neb.Rev.Stat. § 27-902(7) (Reissue 1995).
[78] See, Paulino, supra note 42; U.S. v. Kandiel, 865 F.2d 967 (8th Cir. 1989); U.S. v. Clabaugh, 589 F.2d 1019 (9th Cir.1979). See, also, Burgess v. Premier Corp., 727 F.2d 826 (9th Cir. 1984); 2 McCormick on Evidence, supra note 76, § 226.
[79] See State v. Contreras, 268 Neb. 797, 688 N.W.2d 580 (2004).
[80] See State v. Malone, 4 Neb.App. 904, 552 N.W.2d 772 (1996).
[81] State v. Blair, 272 Neb. 951, 726 N.W.2d 185 (2007); State v. Molina, 271 Neb. 488, 713 N.W.2d 412 (2006).
[82] Molina, supra note 81.
[83] See State v. Clapper, 273 Neb. 750, 732 N.W.2d 657 (2007).
[84] Blair, supra note 81; Molina, supra 81.
[85] See, Molina, supra note 81; State v. Williams, 243 Neb. 959, 503 N.W.2d 561 (1993).
[86] See Neb.Rev.Stat. § 28-405(c)(10) (Cum. Supp.2006).
[87] State v. Johnson, 261 Neb. 1001, 627 N.W.2d 753 (2001).
[88] See Malone, supra note 80.
[89] See, Johnson, supra note 87; State v. Neujahr, 248 Neb. 965, 540 N.W.2d 566(1995).
[90] See NJ12d Crim. 4.2.
[91] State v. Utter, 263 Neb. 632, 641 N.W.2d 624 (2002).
[92] State v. Taylor, 262 Neb. 639, 634 N.W.2d 744 (2001); State v. Becerra, 261 Neb. 596, 624 N.W.2d 21 (2001).
[93] See Gutierrez, supra note 43.
[94] State v. Nelson, 262 Neb. 896, 636 N.W.2d 620 (2001).
[95] State v. Flores, 245 Neb. 179, 512 N.W.2d 128 (1994). disapproved in part on other grounds, State v. Johnson, 256 Neb. 133, 589 N.W.2d 108 (1999).
[96] See, e.g., State v. Faircloth, 181 Neb. 333, 148 N.W.2d 187 (1967).
[97] See State v. Woodruff, 205 Neb. 638, 288 N.W.2d 754 (1980). Compare, Flores, supra note 95; Nelson, supra note 94.
[98] See, Paez v. O'Lone, 772 F.2d 1158 (3d Cir. 1985); U.S. v. Norwood, 140 Fed.Appx. 850 (11th Cir.2005); State v. Palacio, 205 N.J.Super. 256, 500 A.2d 749 (1985); Robinson v. State, 174 S.W.3d 320 (Tex.App.2005).
[99] See, Paez, supra note 98; Palacio, supra note 98. Compare U.S. v. Garcia-Flores, 246 F.3d 451 (5th Cir.2001).
[100] See Anderson, supra note 14.
[101] See, Johnson, supra note 87; State v. Konfrst, 251 Neb. 214, 556 N.W.2d 250(1996).
[102] See Konfrst, supra note 101.
[103] State v. Hernandez, 273 Neb. 456, 730 N.W.2d 96 (2007).
[104] State v. Reid, 274 Neb. 780, 743 N.W.2d 370 (2008).
[105] See § 28-416(2)(b).
[106] See Neb.Rev.Stat. § 28-105 (Cum.Supp. 2006).