Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/12/2017 09:10 AM CST

STATE OF NEBRASKA, APPELLEE, V.
CARL A. HENG, APPELLANT.
___ N.W.2d ___

Filed December 5, 2017.    No. A-16-964.

1. **Trial: Expert Witnesses: Appeal and Error.** An appellate court reviews a trial court's ruling to admit or exclude an expert's testimony for abuse of discretion.

2. **Appeal and Error.** When an issue is raised for the first time in an appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition.

3. **Rules of Evidence: Expert Witnesses.** An expert's opinion is ordinarily admissible under Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 2016), if the witness (1) qualifies as an expert, (2) has an opinion that will assist the trier of fact, (3) states his or her opinion, and (4) is prepared to disclose the basis of that opinion on cross-examination.

4. **Trial: Rules of Evidence: Expert Witnesses.** When an expert's opinion on a disputed issue is a conclusion which may be deduced equally as well by the trier of fact with sufficient evidence on the issue, the expert's opinion is superfluous and does not assist the trier in understanding the evidence or determining a factual issue.

5. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

6. **Trial: Evidence: Records: Proof: Appeal and Error.** An appellate court cannot consider an error assigned on the ground that the trial court excluded evidence unless the record reveals an offer of proof or the offer was apparent from the context within which questions were asked.

7. **Evidence: Appeal and Error.** A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.

8. **Trial: Rules of Evidence: Police Officers and Sheriffs: Evidence: Extrajudicial Statements.** The admissibility of narrative statements made by law enforcement personnel during an interrogation about the veracity or credibility of the defendant should be analyzed under the ordinary rules of evidence; if the defendant's statement is itself relevant, then it must be considered whether the law enforcement statement is relevant to provide context to the defendant's statement.

9. **Verdicts: Juries: Appeal and Error.** Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error.

10. **Trial: Convictions: Evidence.** Where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt.

11. **Jury Instructions: Judgments: Appeal and Error.** Whether jury instructions given by a trial court are correct is a question of law. When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.

12. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.

13. **Jury Instructions.** The trial court may refuse to give a requested instruction where the substance of the request is covered in the instructions given.

14. **Convictions: Evidence: Appeal and Error.** Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.

15. **Self-Defense.** Self-defense is a statutorily affirmative defense in Nebraska.

16. ____. To successfully assert the claim of self-defense, one must, inter alia, have a reasonable and good faith belief in the necessity of using force.
17. **Witnesses: Juries: Appeal and Error.** The credibility and weight of witness testimony are for the jury to determine, and witness credibility is not to be reassessed on appellate review.

Appeal from the District Court for Douglas County: Duane C. Dougherty, Judge. Affirmed.

Stuart J. Dornan and Mallory N. Hughes, of Dornan, Troia, Howard, Breitkreutz & Conway, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

Moore, Chief Judge, and Bishop and Arterburn, Judges.

Arterburn, Judge.

## I. INTRODUCTION

Carl A. Heng was convicted by a jury of manslaughter and use of a deadly weapon to commit a felony. The district court subsequently sentenced Heng to a total of 14 to 22 years' imprisonment. Heng appeals from his convictions here. On appeal, Heng assigns numerous errors, including that the district court erred in excluding certain evidence, in failing to redact portions of Heng's statement to police before allowing the jury to view it, and in refusing to give the jury an instruction regarding the victim's character for violence and aggression. Heng also alleges that there was insufficient evidence to support both his conviction for manslaughter and his conviction for use of a deadly weapon to commit a felony.

Upon our review, we find no merit to Heng's assertions on appeal. Accordingly, we affirm his convictions.

## II. BACKGROUND

The State filed an information charging Heng with second degree murder pursuant to Neb. Rev. Stat. § 28-304 (Reissue 2016) and with use of a deadly weapon to commit

a felony pursuant to Neb. Rev. Stat. § 28-1205(1)(a) (Reissue 2016). The charges against Heng stem from an incident which occurred on August 24, 2015. Evidence adduced at trial revealed that on the night of August 24, Heng got into an argument with Robert Lane in front of an apartment building located near 99th and Q Streets in Omaha, Nebraska. During the argument, Heng pulled a concealed handgun from a holster on his hip and shot Lane. Immediately after shooting Lane, Heng called the 911 emergency dispatch service and provided aid to Lane. Subsequently, Lane died at a hospital. When Heng spoke with law enforcement, he indicated that he had shot Lane in self-defense because he feared for his own life.

Because Heng admitted that he had shot Lane during their argument, the only disputed issue at trial was whether Heng was justified in shooting Lane in defense of himself or in defense of another.

The State presented evidence to demonstrate that Heng was not justified in shooting Lane. The State called Aubrey Strong (Aubrey) to testify about her version of the events which immediately preceded the argument between Heng and Lane. Aubrey was Lane's girlfriend at the time of the shooting. Lane lived with Aubrey at the apartments near 99th and Q Streets where the shooting took place. Aubrey was also friends with Heng. They had met at their place of employment, and although they had previously been in a brief romantic relationship, they were just close friends at the time of the shooting.

Aubrey testified that in the weeks prior to the shooting, Lane had left her apartment for a period of a 1½ or 2 weeks because he had "relapsed" and began using marijuana and cocaine again. Aubrey believed that Lane had checked into some sort of rehabilitation center. Lane returned to Aubrey's apartment only a few days prior to the shooting. While Lane was away, Aubrey and Heng saw each other often. In fact, they began spending nights at each other's apartments.

In the afternoon of August 24, 2015, Aubrey picked up Lane from work. When she picked him up, Lane was talking

to someone on his cellular telephone. Aubrey testified that Lane was talking loudly and "aggressive[ly]." When they arrived at the apartment, Lane indicated that he was going to go to an "AA meeting" and began to get ready to leave. When Lane left the bathroom after taking a shower, Aubrey smelled marijuana and "confronted" Lane about whether he was again using drugs. Lane got upset and began to yell at Aubrey. He also knocked over her jewelry box. While Lane was yelling, Aubrey became scared, ran into the bedroom closet, and shut and locked the door. While Aubrey was inside the closet, Lane punched a hole in the closet door. He then left the apartment and drove away in Aubrey's car.

After Lane left, Aubrey remained at the apartment, waiting for Lane to return. She testified that Lane returned to the apartment approximately 1½ to 2 hours later. When Lane returned, he brought his friend, Brian Steele, with him. At this time, Lane smelled of alcohol and Aubrey observed a bottle of alcohol hidden in Lane's sock. Aubrey and Lane began to argue again after Lane could not find his wallet. Aubrey testified that during the argument, Lane pushed her "[t]wo steps back" against the bedroom door, which "knocked the wind out of [her]," and she fell to the floor. She testified that she felt "petrified" due to Lane's behavior.

After Lane pushed her against the door, Aubrey crawled from the bedroom into the kitchen to get her keys. She then left the apartment. Lane followed her into the parking lot of the apartment building and would not let Aubrey leave. After unsuccessfully struggling with Lane to get into her car, Aubrey returned to the apartment where Lane accused Aubrey of cheating on him. Lane and Steele then left the apartment in Aubrey's car. Aubrey could not recall whether she had given them permission to take her car. Aubrey testified that by this point, she was "the mo[st] scared [she] ha[d] ever been." She also testified that prior to August 24, 2015, Lane had never threatened her or assaulted her.

Aubrey called her younger sister, Emily Strong (Emily), to tell her what happened. Aubrey did not call the police, but

Emily did suggest that Aubrey call Heng, who lived nearby. After speaking with Emily, Aubrey sent Heng a text message which stated, "'If I ever send you a blank message, call the cops.'" Aubrey and Heng then engaged in multiple conversations via text messaging and telephone calls, during which Aubrey told Heng that Lane showed up at her apartment intoxicated, punched a hole in her door, and took her car without her permission. She also lied to Heng and told him that she had already called the police. Heng eventually convinced Aubrey to leave the apartment and to meet him at a nearby gas station. Aubrey testified that she started packing a few things, but that at some point, she changed her mind and told Heng not to come meet her because she did not want him to be "involved." However, she also testified that she believed "100 percent" that she needed to leave the apartment for her own safety.

At some point after her last conversation with Heng, Aubrey left her apartment building and saw Lane lying on the ground. She observed Heng performing cardiopulmonary resuscitation on Lane.

The State also presented the testimony of several witnesses who contradicted Aubrey's version of the events of the evening hours of August 24, 2015. One of Aubrey and Lane's neighbors testified that on that night, she observed Aubrey and Lane get into Aubrey's car at about 6 p.m., which is around the time that Aubrey testified Lane left for his meeting. The neighbor testified that Aubrey and Lane did not appear to be fighting with each other.

The State also offered the testimony of Lane's friend, Steele, who was in the apartment while Aubrey and Lane were fighting. Steele testified that at about 6 or 6:30 p.m. on August 24, 2015, Lane picked him up because Lane wanted to talk. As they were driving, Lane told Steele that he wanted him to meet his new girlfriend, Aubrey. Lane then drove Steele to Aubrey and Lane's apartment. Steele testified that prior to arriving at the apartment, Lane seemed "all right" and did not appear to be angry or agitated.

When Lane and Steele arrived at the apartment, Steele observed there to be some tension between Aubrey and Lane. Steele testified that Aubrey and Lane were arguing with each other and that Aubrey began to cry during the argument. However, he did not observe Lane physically hurt Aubrey. Steele testified that Aubrey never left the apartment while he was there. He also testified that he did observe Lane to be hiding a bottle of alcohol, but indicated that Lane did not appear to be intoxicated.

After being in the apartment for 30 to 45 minutes, Steele asked if someone could take him home. He testified that Aubrey threw her keys at him, telling him to get Lane out of the apartment. On the way back to Steele's house, Steele told Lane to go back home, sleep on the couch, and make a "sober" decision in the morning. In addition, Steele overheard Lane on the telephone apologizing and saying "'I love you.'" Steele assumed Lane was talking to Aubrey.

The State also offered the testimony of a homicide detective for the Omaha Police Department to contradict Aubrey's testimony. The detective testified that when she entered Aubrey's apartment after the shooting, she observed a hole on the inside of the bedroom closet door. This testimony clearly contradicts Aubrey's testimony that Lane punched the outside of the closet door while she was locked inside. In addition, the detective testified that there was no sign of a struggle or a fight in the apartment.

The State played a recording of Heng's interview with Det. Eugene Watson, another homicide detective for the Omaha Police Department. During this interview, Heng discussed his version of the events leading up to the shooting and maintained that he had shot Lane in self-defense during a physical struggle. Heng told Detective Watson that prior to August 24, 2015, Aubrey had told him that she was afraid of Lane. She also told him that Lane had threatened Heng because Lane believed Aubrey was cheating on him with Heng. In the weeks leading up to August 24, Aubrey told Heng that she had ended her relationship with Lane, that she was no longer speaking

to him, and that she had taken him to a rehabilitation center. Heng believed that by August 24, Lane no longer lived in the apartment with Aubrey.

On August 24, 2015, Aubrey texted Heng and told him that Lane had "showed up" at her apartment, had punched a hole in the door, and had stolen her car. Aubrey also indicated that Lane was intoxicated. She told Heng that she had already called the police. Heng told Aubrey to meet him at a nearby gas station so that she could stay at his apartment. Heng subsequently changed his mind about meeting Aubrey at the gas station. Instead, he drove to the parking lot of the "clubhouse" of her apartment complex to wait for her. When he telephoned Aubrey to tell her where he was, she told him that she had called an off-duty police officer who lived in her building to come to her apartment. While Heng was in the parking lot of the clubhouse and still on the telephone with Aubrey, he observed Aubrey's car arrive at the entrance of the apartment complex. Heng observed Lane driving the car "erratic[ally] and very fast." Heng told Aubrey that Lane was back, and Aubrey "panicked."

Heng followed Aubrey's car to the parking lot in front of her apartment building. He got out of the car and started to approach the door to meet Aubrey. Instead, he encountered Lane, who said, "[H]ey, how are you doing?" in a "sarcastic[]" manner. Lane then pushed Heng, and Heng started to back toward the door of the building while Lane followed him. Heng "plead[ed]" with Lane not to go inside. Lane then threatened Heng by saying he would kill him and that he knew where Heng lived. Lane then "came at" Heng and pushed him up against the wall of the building, pinning him there with his entire weight. At this point, Heng was "terrified" and felt he could not get away from Lane as he was pinned in the corner. He was afraid that Lane was going to hurt him or kill him. He was also afraid that if Lane went inside the building, he would hurt Aubrey. Heng felt "powerless" and believed his only option was to shoot Lane with the gun he had holstered on his hip. Heng told Detective Watson that he drew his gun and

fired two or three times from right by his side. He indicated that when he fired the shots, Lane was still touching him. After the shots, Lane staggered back and fell. Heng immediately started to help him and called 911.

Upon further questioning by Detective Watson, Heng admitted that prior to firing the shots, Lane had not hit him and had not choked him. Lane was holding him by his shoulders against the apartment wall. However, Heng also indicated that he did not go to the apartment intending to hurt Lane. He said he did not want to do that. He explained that he has a valid permit to carry a concealed gun.

The State presented the testimony of several witnesses who contradicted Heng's version of the events of the evening hours of August 24, 2015. Jacob Epperson, who was a volunteer firefighter, lived in Aubrey and Lane's apartment building. On August 24, between 9:45 and 10 p.m., Epperson left his apartment to retrieve his pager, which was located in his vehicle parked in front of the apartment building. When Epperson was in the parking lot, he observed two people arguing near one of the entrances to the apartment building. He did not think the argument was "a big deal," so he returned upstairs to his apartment, using the other entrance. He then went out onto the balcony of his apartment, which overlooked the parking lot. Soon after, he heard a shot and observed a "muzzle flash." He saw Heng moving backward away from the door of the apartment building and toward the parking lot. Epperson testified that he observed Heng holding a gun and that his right arm was fully extended. The shot Epperson observed was fired toward the entrance area of the apartment building. Later, Epperson told police that it appeared to him that Heng was about 5 feet away from Lane when he fired the shot.

Epperson called 911 and then went outside to help Lane. Epperson began conducting cardiopulmonary resuscitation. When Epperson was taking care of Lane, Heng repeatedly told him that he had shot Lane in self-defense. When police arrived, Epperson identified Heng as the shooter and indicated that Heng still had a gun.

Epperson's testimony was contradicted by the testimony of his live-in girlfriend, who testified that at the time the gunshots were fired, Epperson was inside the apartment with her. Despite this testimony, Epperson indicated that he was positive he saw the shooting from his balcony.

The State also presented the testimony of two expert witnesses to refute Heng's version of events. Dr. Michelle Elieff is the forensic pathologist who performed the autopsy of Lane after his death. Dr. Elieff testified that Lane had two "major injuries" at the time of his death: a gunshot wound to his left torso and a gunshot wound to the right leg. The cause of Lane's death was the gunshot wound to his left torso. Dr. Elieff explained that the bullet entered from Lane's left side and had a sideways trajectory. It "lacerat[ed] large blood vessels, the aorta and vena cava, and injur[ed] the liver and blood vessels to the right kidney." Dr. Elieff testified that Lane's injuries were not consistent with Heng's story that he had shot Lane while Lane was "pressed against" him. She testified that there was no evidence of "close range" gunfire on Lane's body. Instead, the evidence revealed that both shots were fired from an "indeterminate range." Dr. Elieff explained that an "indeterminate range" indicates that the shooter was "beyond several feet away" from Lane at the time the shots were fired, depending on the type of firearm used. Dr. Elieff also testified that at the time of his death, Lane had marijuana and alcohol in his system.

Molly Reil is a forensic technician with the Omaha Police Department who specializes in firearms and toolmarks examinations. Reil conducted testing to determine how far the end of the gun was from Lane when he was shot. Reil determined that the end of the gun was 2 to 5 feet away from Lane when he was shot in his left torso. She also determined that the end of the gun was 5 feet or more away from Lane when he was shot in the right leg. Reil also completed testing to determine how far the gun was from Heng's shirt when he fired the shots. Based on her tests in conjunction with her review of testing completed by the defense expert, she determined that

the gun was held within 4 to 6 inches of Heng's shirt when it was fired. However, another shot could have been fired from further away.

After the State rested, the defense presented evidence to prove that Heng acted in self-defense when he shot and killed Lane. This evidence consisted primarily of expert testimony concerning the trajectory of the bullets and concerning the distance between the gun and Lane when the shots were fired and other witnesses' opinions about Lane's character for violence and aggression and Heng's character for peacefulness.

Dr. George Nichols is a forensic pathologist who reviewed the records in this case. Based on his review, he opined that Lane died "as a result of a close-range gunshot wound to his abdomen." Dr. Nichols testified to his belief that Lane was approximately 24 to 30 inches from the end of the gun when he was shot. He also indicated that the trajectory of the bullet from the torso wound was consistent with Lane's reaching toward Heng when Lane was shot. However, he also indicated that the trajectory was consistent with Lane's having his left hand raised to unlock the door of the apartment building when he was shot. Dr. Nichols testified that the trajectory of the bullet from Lane's right leg wound was consistent with Heng's falling to his knees as he was shooting. Dr. Nichols admitted that he is not a certified firearms examiner and that he based his opinions on the testing completed by other experts.

During his testimony, Dr. Nichols also opined that abrasions on Lane's hand at the time of his death were consistent with him having recently punched a door. However, Dr. Nichols indicated that Lane could have acquired the abrasions another way. Dr. Nichols opined that red marks on Heng's neck on the night of the shooting could have been caused by someone grabbing him around the neck. However, again, Dr. Nichols also admitted that Heng could have acquired the red marks another way. In fact, he testified that the marks could have been self-inflicted while Heng was nervously sitting in the police interview room for 6 hours.

Ronnie Freels is a forensic firearms examiner who observed the tests conducted by Reil. Based on Freels' interpretation of these tests, he testified that Lane was approximately 24 to 36 inches from the end of the gun when he was shot in the left torso. He testified that the gun was not pressed up against Lane's body when the shot was fired. Freels opined that the gun was approximately 4 inches away from Heng's right side when he shot. However, Freels indicated that another shot could have been fired from further away from Heng's body. During his testimony, Freels questioned the manner in which Lane's clothing had been handled by the Omaha Police Department. He indicated that too much handling of the clothing by different people could decrease the amount of gunshot residue and could affect the results of the tests.

The defense presented evidence to demonstrate that Lane had a history of violent and aggressive behavior, particularly when he was intoxicated. This evidence revealed that in October 2013, Lane was taken to the hospital by ambulance after someone reported he had "overdosed" on alcohol. During the ride to the hospital, Lane was belligerent and combative. He had to be held down by three firefighters. When Lane arrived at the hospital, he continued to be combative. At one point, Lane kicked a hospital security guard in the shoulder while the guard was attempting to restrain him so that medical personnel could help him. He was later convicted of assaulting the security guard and served 10 days in jail.

In August 2014, police were called to Lane's father's home. Lane's father told police that Lane had "tackled and assaulted" him. Lane was "argumentative and disruptive" when police tried to speak with him. He threatened one police officer. As a result of this incident, Lane pled guilty to assault and was sentenced to 30 days in jail.

Other evidence revealed that one of Lane's previous girlfriends believed Lane to be a violent person after he acted very paranoid while under the influence of methamphetamine and after he would not let her leave her bathroom during an argument. Emily, Aubrey's younger sister, testified that she

also believed that Lane was a "violent and aggressive" person. She referred to Lane as "a ticking time bomb." Emily had briefly lived with Aubrey and Lane the month prior to the shooting. While Emily lived with them, she observed Lane to be "verbally aggressive" toward Aubrey. On one occasion, Emily and Lane were alone in the apartment. She became afraid of Lane because he was upset with Aubrey and yelled at Aubrey over the telephone. Emily indicated that she never observed Lane to physically hurt Aubrey and that Lane never physically hurt her.

The defense presented evidence to demonstrate that Heng had a reputation for being a peaceful person. Heng's friends and family testified that Heng had a reputation for being a peaceful and honest person. These witnesses stated that "[e]veryone loves [Heng]" and that Heng was "a kind and even-keeled and quiet person." These witnesses also testified that Heng took his handgun with him wherever he went. Other evidence presented by the defense indicated that Heng had taken courses to learn to use a handgun and to obtain a permit to carry a concealed gun.

At the close of the defense's case, the State called a rebuttal witness to testify. The rebuttal witness was Lane's "Alcoholics Anonymous sponsor" since 2014. He testified that beginning in 2014, he had met with Lane at least one time per week. He believed that Lane was generally a peaceful person. However, he testified that even Lane admitted to having anger issues, particularly when he was intoxicated. He said that Lane was "very motivated . . . to change his life," though. In addition, Lane was very involved with Alcoholics Anonymous and was very helpful to other members of the group.

After hearing all of the evidence, the jury convicted Heng of manslaughter, rather than second degree murder, as the State charged in the information. The jury also convicted Heng of use of a weapon to commit a felony. The district court subsequently sentenced Heng to a total of 14 to 22 years' imprisonment.

Heng appeals.

## III. ASSIGNMENTS OF ERROR

On appeal, Heng assigns and argues five errors, which we consolidate and renumber for our review. First, Heng argues that the court erred in excluding expert testimony regarding Heng's state of mind at the time of the shooting and erred in excluding the recording of the 911 call made by Epperson after the shooting. Second, Heng asserts that the district court erred in failing to redact portions of Heng's interview with Detective Watson prior to showing the interview to the jury. Third, Heng asserts that the district court erred in failing to provide the jury with an instruction about Lane's character for violence. Finally, Heng asserts that there was insufficient evidence to support his convictions.

## IV. ANALYSIS

### 1. Exclusion of Evidence

On appeal, Heng challenges certain evidentiary decisions made by the district court. Specifically, he challenges the court's decision to exclude the testimony of a psychologist who evaluated Heng after the shootings and the court's decision to exclude a recording of the 911 call Epperson made immediately after the shooting. We address each of Heng's assertions separately below.

### (a) Psychologist's Opinion

Prior to trial, defense counsel indicated an intention to call Kirk Newring, Ph.D., as a witness. Dr. Newring is a licensed psychologist who conducted a psychological interview of Heng and who completed research on the topic of how individuals respond when presented with extremely stressful, life-threatening situations. The defense intended Dr. Newring to testify to the following conclusions:

> [D]uring the interval of approximately 9:45p.m. - 9:57p.m. Monday August 24, 2015
>
> (1) . . . Heng was not suffering from a mental disease or defect; nor was he under the influence of any prescription or non-prescription medication or substance;

(2) . . . Heng believed that deadly force was necessary for the purpose of protecting himself against the use of unlawful force being inflicted upon him by . . . Lane;

(3) . . . Heng believed that deadly force was immediately necessary to protect himself against death or serious bodily harm;

(4) . . . Heng believed that . . . Lane initiated an unlawful physical assault against . . . Heng;

(5) . . . Heng believed . . . Lane's threat of "I'll kill you. I know where you live."

(6) . . . Heng could not appreciate, perceive, or access any means of safe escape or retreat;

(7) . . . Heng believed that . . . Lane's threat to kill . . . Heng and . . . Lane's physical assault and confining of . . . Heng was unlawful.

However, defense counsel indicated that Dr. Newring would not testify whether Heng's actions on the night of August 24, 2015, were reasonable.

The State filed a motion in limine asking that Dr. Newring's testimony be excluded from trial. Specifically, the State argued that Dr. Newring did not qualify as an expert witness, that his testimony was not relevant, and that his testimony would not assist the trier of fact in any way. Essentially, the State asserted that Dr. Newring's opinion concerning Heng's state of mind at the time of the shooting should not be admitted because such a finding of fact "should be left to the province of the jury." A pretrial hearing was held on the State's motion in limine.

For purposes of the motion in limine, Dr. Newring's report was received into evidence. The parties agreed that if allowed to testify, Dr. Newring would testify to "exactly" what was contained in his report. The report has essentially five sections. First, Dr. Newring briefly describes his professional education, background, and current areas of practice. A more complete recitation of this information is contained in Dr. Newring's curriculum vitae, which was also admitted at the hearing. Second, he recounts the records and documents he reviewed

pertinent to this case along with reporting that he conducted a psychological evaluation of Heng. Third, he basically describes his own "findings of fact" as to what he believes happened before and during the encounter between Heng and Lane. Fourth, he sets forth a review of literature in the "field of threat assessment" and "the appraisal of risk in interpersonal conflict." This includes literature on the effect of stress and anxiety and its impact on cognitive processes. Finally, he states his seven conclusions as recounted above.

After the hearing, the district court entered an order sustaining the State's motion in limine and precluding Dr. Newring from testifying at trial. The court stated:

[Dr. Newring's] expert opinions shall be excluded because they are merely being offered as nothing more than an expression of how the trier of fact should decide this case and that the expert's opinions being set forth, which obviously are disputed material issues in [Heng's] defense, are conclusions which may be deduced equally as well by a trier of fact with sufficient evidence on the issue. The Court finds these expert opinions to be superfluous and would not assist the triers of fact in this matter in understanding the evidence or determining a factual issue.

The Court notes that the first finding of Dr. Newring is that there are no factual allegations of any mental disease or defect that [Heng] was suffering at the relevant time. Without at least some finding of this, the Court clearly finds that these opinions would be merely offered for bolstering of [Heng's] testimony.

Although [Heng] argues that they would not be offering these opinions for determination of reasonableness of [his] actions, they clearly are offering these opinions pertaining to what [he] may or may not have believed at the moment of the occurrence of the events that brought about this case. What [Heng] reasonably believed is clearly a material element of the defense of self-defense. That clearly is a determination to be made by the fact finder.

> There being no unique mental illness or defect of [Heng]
> that exists, the Court does not find that Dr. Newring's
> opinion would in any way assist the Jury in understanding
> the evidence in this case.

Defense counsel renewed his motion to have Dr. Newring
testify, which renewal occurred on the eve of trial after the
district court decided to admit into evidence the entirety of
Heng's interview with Detective Watson. The court denied
counsel's request.

On appeal, Heng asserts that the district court erred in
not allowing Dr. Newring to testify. Specifically, he alleges
that because Dr. Newring was not allowed to testify, he was
"denied . . . his Sixth Amendment Constitutional right to pre-
sent a defense under the compulsory clause." Brief for appel-
lant at 32. He also alleges that the district court incorrectly
applied the rules of evidence in prohibiting Dr. Newring's
testimony. Heng alleges that the court's exclusion of the tes-
timony was particularly egregious in light of the statements
made by Detective Watson during his interview with Heng.
Upon our review, we conclude that Heng's assertions do not
have merit.

### (i) Standard of Review

[1] An appellate court reviews a trial court's ruling to admit
or exclude an expert's testimony for abuse of discretion. *State
v. Braesch*, 292 Neb. 930, 874 N.W.2d 874 (2016).

### (ii) Analysis

[2] Initially, we note that Heng failed to raise his consti-
tutional argument to the district court. Instead, Heng argued
only that Dr. Newring's testimony was admissible pursuant
to the relevant rules of evidence. Accordingly, we do not
address Heng's constitutional claims in this appeal. When an
issue is raised for the first time in an appellate court, it will
be disregarded inasmuch as a lower court cannot commit error
in resolving an issue never presented and submitted to it for
disposition. *State v. Thompson*, 278 Neb. 320, 770 N.W.2d
598 (2009).

[3] Heng's assertion that the district court erred in excluding Dr. Newring's testimony based on the relevant rules of evidence is without merit. An expert's opinion is ordinarily admissible under Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 2016), if the witness (1) qualifies as an expert, (2) has an opinion that will assist the trier of fact, (3) states his or her opinion, and (4) is prepared to disclose the basis of that opinion on cross-examination. *State v. Mason*, 271 Neb. 16, 709 N.W.2d 638 (2006). In our reading of the State's brief on appeal, it does not appear that the State is challenging Dr. Newring's qualifications to testify as an expert witness. Rather, it appears that both Heng and the State focus their arguments about the admissibility of Dr. Newring's testimony on whether such testimony would have assisted the jury. In addition, we note that in its order sustaining the State's motion in limine, the district court indicated that it based its decision to exclude Dr. Newring's testimony on its conclusion that the testimony "would not be . . . helpful to the jury."

[4] If a witness is qualified as an expert pursuant to rule 702, a court considering admissibility of the expert's testimony, which may include an opinion, must decide whether the testimony is likely to assist the trier of fact to understand the evidence or determine a factual issue. *State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990). The Nebraska Supreme Court has previously held that when an expert's opinion on a disputed issue is a conclusion which may be deduced equally as well by the trier of fact with sufficient evidence on the issue, the expert's opinion is superfluous and does not assist the trier in understanding the evidence or determining a factual issue. *Id.*

In this case, if permitted, Dr. Newring would have testified that Heng did not suffer from a mental disease or defect, nor was he under the influence of any drugs or alcohol at the time of the shooting. In addition, Dr. Newring would have testified that considering all of the circumstances of the night of August 24, 2015, he believed that Heng shot Lane due to an imminent fear for his own safety. Given our review of the

record, we do not find that the court abused its discretion in excluding Dr. Newring's testimony.

In Dr. Newring's report, he fails to explain how the literature he reviewed and cited supports his conclusions as to what Heng believed. Our review of the report reveals that the connection between the research and the facts of this case is tenuous. Moreover, summarized, the literature confirms only what would seem to be commonly known: when people are placed under stressful circumstances, such as a shoot/no shoot scenario, their decisions may be affected by a number of variables, including, but not limited to, the nature of the appreciated threat, anxiety, gender, and exertion needed to respond to the situation. There is little in Dr. Newring's report which specifically relates these factors to Heng.

Dr. Newring's testimony would not have assisted the jury in evaluating the circumstances surrounding Lane's death and deciding whether Heng reasonably feared for his life when he shot and killed Lane and thus acted in self-defense. As Dr. Newring, himself, indicated, Heng did not suffer from any mental disease or defect, the effects of which would need to be explained to a jury. Based on our understanding of Dr. Newring's proposed testimony, such testimony would amount to nothing more than a statement by a psychologist that he believed Heng's version of events. Such testimony appears to be relevant only to bolster Heng's credibility. This is not permissible. We affirm the decision of the district court to exclude Dr. Newring's testimony.

We note that in Heng's brief on appeal, he asserts that the court's decision to exclude Dr. Newring's testimony should have been reevaluated in light of the admission of the entirety of his interview with Detective Watson and Detective Watson's statements therein about the law of self-defense. We find Heng's assertion in this regard to be without merit. Principally, the statements made by Detective Watson in the interview do not constitute testimony. Moreover, the court instructed the jury not to consider Detective Watson's statements "regarding self-defense, defense of another[,] or guilt

or innocence" for any purpose other than context for Heng's responses. We will further discuss Heng's interview with Detective Watson later in our analysis.

### (b) Epperson's 911 Call

During defense counsel's cross-examination of Epperson, counsel offered into evidence a recording of the telephone call Epperson initiated to 911 immediately after the shooting. The State objected to the admission of this recording on the basis that it was hearsay. Defense counsel argued that the contents of the recording were not hearsay because the statements made by Epperson were excited utterances made close in time to a "startling event" and because the statements relayed Epperson's state of mind at the time of the events. A recess was taken, and the recording was played for the trial judge outside the presence of the jury. After hearing the recording, the court sustained the State's objection and did not allow the jury to hear the 911 call.

On appeal, Heng argues that the district court erred in not admitting the recording of the 911 call into evidence. Specifically, he argues that the court's failure to admit the recording into evidence violated both his constitutional right to confront the witnesses who testified against him and the relevant rules of evidence. We find Heng's assertions to be without merit.

### (i) Standard of Review

[5] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57 (2008). When judicial discretion is not a factor in assessing admissibility, whether the underlying facts satisfy the legal rules governing the admissibility of such evidence is a question of law, subject to de novo review. See *id*. But where the Nebraska Evidence Rules commit the evidentiary question at

issue to the discretion of the trial court, we review the admissibility of evidence for an abuse of discretion. *Id*.

### (ii) Analysis

Again, we note that Heng failed to raise his constitutional argument to the district court. Instead, Heng argued only that the recording should be admissible pursuant to the relevant rules of evidence. Accordingly, we do not address Heng's constitutional claims in this appeal. As we stated above, when an issue is raised for the first time in an appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition. See *State v. Thompson*, 278 Neb. 320, 770 N.W.2d 598 (2009).

[6] In addition, we conclude that we are unable to address the merits of Heng's assertion that the district court erred in failing to admit the recording based on the rules of evidence. Although defense counsel played the recording for the district court, after the court sustained the State's objection, counsel failed to make an offer of proof in order to include in our record either the recording itself or a transcript of the recording. An appellate court cannot consider an error assigned on the ground that the trial court excluded evidence unless the record reveals an offer of proof or the offer was apparent from the context within which questions were asked. See *State v. Schreiner*, 276 Neb. 393, 754 N.W.2d 742 (2008). Here, defense counsel did not make an offer of proof at trial and therefore the issue of the admissibility of the recording is not preserved for appellate review. Without knowing the specific contents of the complete recording, including the exact language used by Epperson or the tone of his voice, we simply cannot say whether the district court erred in sustaining the State's objection.

However, we also find that even if the district court did err in excluding the recording of Epperson's 911 call, such error was harmless. On appeal, Heng argues that the 911 call was necessary to impeach Epperson's trial testimony

that he had seen Heng shoot Lane. During defense counsel's cross-examination of Epperson, counsel effectively impeached him using excerpts from the 911 call. Counsel questioned Epperson about what he said during his 911 call and how what he said then was different than what he testified to at trial. Specifically, upon questioning by defense counsel, Epperson admitted that during the course of the 911 call, he twice asked Heng where the shooter was, even though at trial he testified that he already knew who the shooter was because he saw Heng shoot Lane. Epperson also admitted that he did not tell the 911 operator that he saw the shooting, only that shots had been fired at his apartment building. In addition, defense counsel further impeached Epperson's testimony using portions of the statements he gave to police and using the testimony of his live-in girlfriend, who specifically testified that Epperson did not see the shooting.

Heng's assertions that the district court erred in sustaining the State's objection to the recording of Epperson's 911 call are without merit.

### 2. Failure to Redact Heng's Interview With Detective Watson

Prior to trial, defense counsel filed a motion in limine asking the court to exclude certain portions of the recording of Heng's interview with Detective Watson prior to showing that interview to the jury. Specifically, counsel requested that the court redact from the recording narratives made by Detective Watson regarding "his interpretation of the law of self-defense." In support of the motion, counsel submitted to the district court a redacted copy of the transcript of the interview. This transcript includes 13 separate redactions of statements made by Detective Watson. Each of these redactions occur toward the end of the interview after Heng described his version of the events surrounding the shooting. While we do not recount each separate redaction here, we do provide two examples of the redacted language which are representative of the theme of the statements in question.

At one point during the interview, Heng reiterates that he felt justified in using deadly force against Lane because Lane threatened to kill him. Detective Watson responds as follows:

> He threatened to kill you. I get threatened all the time . . . by people that are very capable of killing me. I can't just gun them down. If they produce a gun, if they produce a weapon, then that gives you ground to use deadly force. You didn't tell me any of this. Witnesses are not seeing any of this. Witnesses have you with your arm extended, firing two shots, backing away from him. How is that a threat? . . . [Y]ou can't scare yourself into shooting people. And like I said, if that's your mindset, you should have never been carrying a gun on your hip.

Later, Detective Watson stated:

> You can't feel fear and use deadly force. You can't imagine what would happen to you, or someone else, and use deadly force. You have to either see it, and respon[d] to it. Hey, get off of her. Hey, get your hands from around her neck. If you don't stop choking her, I'm going to shoot you. [Lane], get your hands off of me. Don't do that. If you don't back away from me, I'm going to shoot you. If you don't get your hands from my neck, I'm going to shoot you. If you don't stop beating me, like I'm some . . . rag doll, I'm going to shoot you. You understand what I'm saying?

The State objected to the defense's motion in limine. The State argued that Detective Watson's statements concerning the law surrounding the use of force and self-defense were merely an interview technique used to elicit further information from Heng. The State indicated that Detective Watson's statements were relevant to show the context of the entire interview.

Ultimately, the district court denied the motion in limine and allowed the entire interview to be played for the jury. However, during defense counsel's cross-examination of Detective Watson, counsel asked him about his opinions concerning the use of force and self-defense:

[Defense counsel:] And you were trying to get . . . Heng to agree with your theory, which was that you believed the other witnesses and not him, for the last ten minutes of that interview?

[Detective Watson:] Yes.

[Defense counsel:] As an investigator, you're supposed to develop facts and record facts; right?

[Detective Watson:] That is correct.

[Defense counsel:] Your opinion doesn't mean squat, does it?

[Detective Watson:] My opinion does not mean anything.

[Defense counsel:] None at all?

[Detective Watson:] None at all.

In addition, the district court instructed the jury about Detective Watson's statements during the interview. Jury instruction No. 18 stated:

During the course of the trial, the State offered into evidence the video recording of [Heng's] statement to Detective Watson. The officer's statements, opinions or assertions are offered solely to provide context to [Heng's] relevant responses. His comments and statements as to the law regarding self-defense, defense of another[,] or guilt or innocence are not to be considered by you. Only [Heng's] responses should be considered as evidence. In applying the law to this case, you must rely on these Instructions alone.

On appeal, Heng asserts that the district court erred in failing to redact from the recording of Heng's interview Detective Watson's narratives about use of force and self-defense. Specifically, Heng asserts that the failure to redact the interview was error because Detective Watson's statements were inadmissible hearsay which is precluded by the Confrontation Clause of the U.S. Constitution, because permitting Detective Watson to testify as an expert witness without first qualifying him as an expert violated his right to due process, and

because failure to redact Detective Watson's statements violated certain evidentiary rules.

### (a) Standard of Review

[7] A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion. *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017).

### (b) Analysis

Heng failed to raise his constitutional arguments to the district court. At trial, he did not argue that the admission of the entirety of the interview violated the Confrontation Clause of the U.S. Constitution or violated his right to due process. Instead, as we discussed above, Heng argued only that portions of the recording should be inadmissible pursuant to the relevant rules of evidence. Accordingly, we do not address Heng's constitutional claims in this appeal. As we stated in our analysis above, when an issue is raised for the first time in an appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition. See *State v. Thompson*, 278 Neb. 320, 770 N.W.2d 598 (2009).

Heng asserts that the statements made by Detective Watson about the law of self-defense and use of force should have been redacted from Heng's interview with Detective Watson because the statements were not relevant and, essentially, permitted Detective Watson to tell the jury his opinion about whether Heng was acting in self-defense.

[8] Recently, the Supreme Court addressed the admissibility of recorded interviews which include narrative statements by law enforcement personnel about the veracity or credibility of the defendant. In *State v. Rocha, supra*, the court held that the admissibility of narrative statements made by law enforcement personnel during an interrogation about the veracity or credibility of the defendant should be analyzed

under the ordinary rules of evidence; if the defendant's statement is itself relevant, then we must consider whether the law enforcement statement is relevant to provide context to the defendant's statement. The court also stated, "To do this, we consider whether the defendant's statement would be any less probative in the absence of the law enforcement statement. If the law enforcement statement does not make the defendant's statement any more probative, it is not relevant." *Id*. at 741, 890 N.W.2d at 199.

We recognize that there is clearly a distinction between the facts of *State v. Rocha, supra*, and the facts of this case. In *State v. Rocha, supra*, the statements at issue related to whether the defendant was telling the truth during the interview. In this case, the statements at issue relate to whether Detective Watson believed that Heng had acted in self-defense given his version of the events surrounding the shooting. Essentially, the statements concern Detective Watson's interpretation of the law of self-defense and his opinion about whether Heng was legally justified in shooting Lane. Despite this distinction, we find that the analysis laid out in *State v. Rocha, supra*, is applicable here. Given this finding, we analyze first whether Heng's statements in response to Detective Watson's statements were relevant and second whether Detective Watson's statements make Heng's statements any more probative.

We have reviewed Heng's interview with Detective Watson in its entirety. We find that Heng's statements in response to Detective Watson's narratives about the law of self-defense and use of force are relevant to a determination of whether Heng was justified in shooting Lane. Upon Detective Watson's questioning, Heng further describes why he was in fear of Lane at the time of the shooting. He also gives some indication that the events surrounding the shooting happened so fast that he does not necessarily have a clear memory of every detail. In addition, we note that during Detective Watson's questioning, the manner in which Heng answered questions appeared to change. This change in demeanor is also relevant to a determination of Heng's credibility during the interview.

We also find that, with one exception, Detective Watson's statements to Heng about the law of self-defense and use of force were relevant to provide context to Heng's statements and admissions. If Detective Watson's statements were redacted from the interview, Heng's statements could be misinterpreted and Heng's change in demeanor as a result of those statements could be misconstrued. For the most part, we find that Detective Watson's statements about the law of self-defense and use of force constituted an interview technique which was meant to elicit further conversation with Heng.

Additionally, we find that Detective Watson's statements were adequately tempered by the court's explicit instructions to the jury that it was not to consider Detective Watson's statements except to provide context to Heng's statements. Specifically, as we stated above, jury instruction No. 18 instructed the jury to consider only Heng's responses to Detective Watson's statements as evidence. The instruction also stated that members of the jury were not to consider Detective Watson's statements, opinions, or assertions for anything other than to provide context to Heng's statements. In addition, as a part of the jury instructions, in jury instruction No. 8, the court specifically informed the jury of the elements that must be proved to establish a claim of self-defense. We note that Detective Watson, himself, told the jury during cross-examination that his statements about the law of self-defense and use of force were only his opinion, which "does not mean anything." Finally, we note that during a sidebar discussion just prior to the playing of the interview for the jury, Heng's counsel inquired whether the court would give a limiting instruction concerning the interview at the close of the evidence as part of the jury instructions. Counsel did not request that a limiting instruction be given prior to the playing of the interview. The court did note the agreement of the parties that the jury would be advised that the recording would not be provided to them during deliberations.

We do find that the court erred in failing to redact one statement made by Detective Watson during the interview. This

lengthy narrative comes at the end of the interview and states as follows:

> But you cannot scare yourself into using deadly force. There has to be an actual threat. There has to be an attack in progress. He has to be actively punching you, almost to a bloody pulp. Even then are you still justified in using deadly force? I don't know. I can't answer that. But I can tell you other people that's been in your situation that use deadly force, it's not something that they thought was going to happen. It's oh my God, He got a knife. It's oh my God, he got a gun. Oh my God, he's swinging that knife at me. Oh my God, he's choking . . . me, I can't breathe, I feel as though I'm going to pass out. Oh my God, if I get punched one more time by this guy, I think I might get knocked out. What will happen to me if he knocks me out? I don't see any swollen lips, I don't see a bloody nose, I don't see swollen, I don't see a severely broken wrist bone, leg on your person. You can['t] think someone's a bad ass, to shoot them. You can't feel as though someone's going to do something to you and be justified shooting them. It's a different story if you would have showed up there and his hands were wrapped around Aubrey's neck, her eyes are rolled back into the back of her head, she's gasping for air. Then . . . .

After this narrative, Heng does not respond and the interview concludes. Because this lengthy statement by Detective Watson does not elicit any further information from Heng, we find that it should have been redacted from the interview prior to it being shown to the jury. This statement does not have any relevance to Heng's guilt or innocence. The district court erred in failing to redact the statement.

[9,10] However, we conclude that the district court's failure to redact this final statement by Detective Watson was harmless. Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error, a guilty

verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error. *State v. Lester*, 295 Neb. 878, 898 N.W.2d 299 (2017). Where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt. *Id*. Detective Watson's concluding statements were a repetition of his previous statements to Heng about the law of self-defense and use of force. In light of Detective Watson's prior statements in the interview which we found to be admissible to provide context, the jury's guilty verdict was surely unattributable to Detective Watson's concluding remarks. This is especially true given the explicit instruction to the jury admonishing them not to consider Detective Watson's statements for any purpose other than as context to Heng's responses.

In its brief to this court, the State acknowledges that given the nature of Detective Watson's comments during his interview with Heng, this issue is a "close[] call." Brief for appellee at 24. We agree with the State's assessment. Detective Watson's explanations in both tone and content come dangerously close to being unfairly prejudicial. However, Heng's responses were relevant and the context to these responses was also relevant. Given the specific instructions provided by the district court, combined with Detective Watson's own testimony on cross-examination regarding the lack of value of his opinion, we cannot find that unfair prejudice occurred. Under our deferential standard of review, we do not find that the district court abused its discretion in failing to redact Detective Watson's comments from the recording of the interview.

We conclude that, with one exception, the district court did not abuse its discretion when it admitted into evidence the entirety of Detective Watson's interview with Heng. In addition, we find that the court's error in failing to redact the final statement of Detective Watson was harmless. Accordingly, Heng's assertions about the admission of the interview are without merit.

### 3. Jury Instruction

Heng requested that the district court include an instruction on Lane's character for violence and aggression. Heng's proposed instruction read in relevant part as follows:

> Evidence of the victim's character for violence, assaultive behavior and aggression has been offered to help you decide whether the defendant acted in self-defense or defense of another, as set forth in Instruction Nos. 7, Section 2. You may consider this evidence along with all the other evidence in making your decision.

The State objected to the proposed instruction. At the jury instruction conference, the district court indicated its refusal to include this proposed instruction in the jury instructions.

On appeal, Heng asserts that the district court erred in refusing his proposed jury instruction about Lane's character for violence and aggression. He argues that failure to instruct the jury in this regard "resulted in a miscarriage of justice." Brief for appellant at 48. We disagree with Heng's assertion.

### (a) Standard of Review

[11] Whether jury instructions given by a trial court are correct is a question of law. When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below. *State v. McCurry*, 296 Neb. 40, 891 N.W.2d 663 (2017).

### (b) Analysis

[12] To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *Id*. We determine that based on the evidence in this case, the instructions given by the court were adequate and Heng was not prejudiced by the court's refusal to give his proposed instruction.

In his brief on appeal, Heng alleges that his proposed instruction should have been included in the jury instructions based on the language of a pattern jury instruction. Specifically, Heng indicates that NJI2d Crim. 5.5 provides that a court should instruct a jury concerning evidence presented about a particular character trait of a victim, in this case about the victim's character for violence and aggression. However, NJI2d Crim. 5.5 does not discuss the victim's character at all. Instead, that pattern jury instruction relates only to evidence of a particular character trait of the defendant. In addition, Heng cites to this court's decision in *State v. Lewchuk*, 4 Neb. App. 165, 539 N.W.2d 847 (1995), to support his argument about the proposed instruction. We agree that *State v. Lewchuk, supra*, does address the admissibility of evidence concerning a victim's character for violence and aggression in a self-defense case. We held therein that the district court committed prejudicial error by excluding admissible testimony regarding specific instances of prior violent conduct by the victim. However, our opinion in *State v. Lewchuk, supra*, does not address whether a specific jury instruction regarding such evidence should be given. In fact, it does not address jury instructions at all. Accordingly, Heng has failed to provide us with any legal basis which would have required the district court to give the proposed jury instruction.

[13] Moreover, our reading of the jury instructions which were actually provided to the jury reveals that the jury was adequately informed by other instructions that it should consider the evidence presented about Lane's character for violence and aggression in its determination about whether Heng acted in self-defense. As such, Heng's proposed instruction would have been superfluous. The trial court may refuse to give a requested instruction where the substance of the request is covered in the instructions given. *State v. Samuels*, 205 Neb. 585, 289 N.W.2d 183 (1980).

Jury instruction No. 7 informed the jury that it should consider whether Heng acted in self-defense when he shot and killed Lane. The instruction informed the jury that in

considering Heng's self-defense claim, it should determine, among other things, whether Lane "attempted to cause or threatened to cause death or serious bodily harm to [Heng]" and whether Heng "reasonably believed that his use of deadly force was immediately necessary to protect himself against any such force used by . . . Lane." In addition, jury instruction No. 13 instructed the jury to consider "[t]he testimony of the witnesses" in coming to its ultimate decision. This testimony would include the substantial amount of testimony produced by the defense regarding Lane's character as it relates to violence and aggression. These instructions, taken together, and in conjunction with the remaining instructions, instructed the jury to consider all of the witness testimony in deciding whether Heng acted in self-defense when he shot Lane. Heng's proposed instruction highlighting Lane's history was not necessary. As a result, the district court's failure to give the proposed instruction did not result in any prejudice to Heng.

### 4. Sufficiency of Evidence

Heng alleges that the evidence presented at trial sufficiently established his claim of self-defense and that there was insufficient evidence to support a finding that he did not act in self-defense. Upon our review, we conclude that the evidence presented at trial was sufficient to support Heng's convictions and, thus, was sufficient to disprove Heng's claim of self-defense. Accordingly, we affirm.

### (a) Standard of Review

[14] Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence

admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. France*, 279 Neb. 49, 776 N.W.2d 510 (2009).

(b) Analysis

[15,16] Self-defense is a statutorily affirmative defense in Nebraska. *Id*. Neb. Rev. Stat. § 28-1409 (Reissue 2016) provides:

(1) . . . [T]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

. . . .

(4) The use of deadly force shall not be justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily harm, kidnapping or sexual intercourse compelled by force or threat, nor is it justifiable if:

. . . .

(b) The actor knows that he can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserting a claim of right thereto or by complying with a demand that he abstain from any action which he has no duty to take[.]

The Nebraska Supreme Court has previously held that to successfully assert the claim of self-defense, one must, inter alia, have a reasonable and good faith belief in the necessity of using force. *State v. France, supra*. See *State v. Iromuanya*, 272 Neb. 178, 719 N.W.2d 263 (2006).

Heng had the initial burden of going forward with evidence of self-defense; after he did so, the State had the burden to prove that he did not act in self-defense. See *State v. France, supra*. The recording of Heng's interview with Detective Watson was played for the jury during the trial. In this interview, Heng stated that he acted in self-defense when he shot

Lane. Heng described that he fired his gun while Lane had his entire weight pressed against him and was holding him against the exterior wall of the apartment building. In addition, Heng stated that he believed he had no choice but to shoot Lane and that he believed Lane might seriously hurt or kill him if he did not immediately shoot. However, other evidence presented at the trial contradicted Heng's claim of self-defense. Such evidence included the testimony of Epperson, who testified that he saw from the balcony of his apartment Heng shoot Lane. He told police that when Heng fired at Lane, Heng was approximately 5 feet away from Lane and was backing up toward the parking lot of the apartment building. Epperson's testimony, if believed by the jury, suggests that Heng was not in imminent danger when he fired at Lane and further suggests that Heng could have safely retreated from the situation without firing his gun.

Other evidence presented at trial supports Epperson's testimony. Both the State's expert, Reil, and the defense's expert, Freels, testified that when Heng shot Lane in the left torso, the end of the gun was at least 2 to 3 feet from Lane. Reil opined that the end of the gun could have been as much as 5 feet away from Lane at that time. Both experts agreed that Heng's claim that Lane was pushed up against him at the time he fired his gun was not supported by the physical evidence. In addition, Dr. Elieff testified that there was no evidence of "close range" gunfire when she examined Lane's injuries. She opined that Lane was shot from "beyond several feet away."

Portions of Heng's interview with Detective Watson also contradict his claim of self-defense. Heng specifically indicated to Detective Watson that prior to Heng's firing his gun, Lane had not hit him or choked him. These admissions call into question the reasonableness of Heng's use of deadly force.

Based on the evidence presented at trial, the jury could have concluded that Heng's use of deadly force against Lane was not reasonable given the circumstances surrounding the shooting. As such, the jury could have found that Heng did not act in self-defense when he shot and killed Lane.

[17] The credibility and weight of witness testimony are for the jury to determine, and witness credibility is not to be reassessed on appellate review. *State v. France*, 279 Neb. 49, 776 N.W.2d 510 (2009). Any conflicts in the evidence or questions concerning the credibility of witnesses are for the finder of fact to resolve. *Id*. Because it found Heng guilty of manslaughter and use of a deadly weapon to commit a felony, the jury apparently disbelieved Heng's assertion that he acted in self-defense. Further, as we stated above, there was sufficient evidence presented to support a finding that Heng did not act in self-defense, and we will not reassess the jury's finding on appeal.

## V. CONCLUSION

Upon our review, we affirm Heng's convictions for manslaughter and use of a weapon to commit a felony. We find there was sufficient evidence to support the jury's conclusion that Heng did not act in self-defense when he shot and killed Lane. We also find that Heng's assertions of error on appeal are without merit.

Affirmed.